**Revised July 10, 2001**

**UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 00-50323

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

EDWARD JIMENEZ, also known as Big Eddie;
PAUL SANTIVANEZ,

Defendants-Appellants.

Appeals from the United States District Court
for the Western District of Texas

June 29, 2001

Before EMILIO M. GARZA and PARKER, Circuit Judges, and ELLISON, District Judge.[*]

KEITH P. ELLISON, District Judge:

Appellants Edward Jimenez and Paul Santivanez were convicted of arson causing

---

[*] United States District Judge for the Southern District of Texas, sitting by designation.

death, firearms violations, and conspiracy. They appeal their convictions and life sentences. Both appellants argue that, as applied to them, the federal arson statute is unconstitutional. They also challenge several of the trial court's evidentiary rulings, its jury instructions, and its refusal to dismiss the indictment for allegedly prejudicial pre-indictment delay. Finally, Jimenez challenges his prosecution as violating a prior grant of immunity, and the district court's refusal to depart downward based on the fact that Jimenez was a minor at the time of the offenses. For the reasons stated below, we affirm.

## I

The testimony at trial established that on the evening of September 7, 1993, Edward "Big Eddie" Jimenez, Paul Santivanez, Brian Mahan, Heriberto "Little Eddie" Hernandez, and Richard Cortez gathered in Cortez's garage. With the exception of Little Eddie, all were members of the Klan street gang led by Cortez. Jimenez and Santivanez discussed retaliating against Jeremy Cruz, a member of the rival Klik street gang, for Cruz's alleged involvement in a recent drive-by shooting.[1]

Santivanez told the others that he knew where Cruz lived, and that Cruz drove a yellow Camaro. Jimenez added that he knew how to make Molotov cocktails, and had recently firebombed the house of Klik member Jason Hernandez.[2] Using supplies purchased by Santivanez, Jimenez made two Molotov cocktails using empty malt liquor

---

[1] During the previous month, police had responded to a drive-by shooting from a Camaro at Jimenez's residence.

[2] In August 1993, Jimenez threw a Molotov cocktail into the residence of Jason Hernandez. Jimenez was convicted in state court, in August 1995, of the Hernandez firebombing.

2

bottles, flammable liquid, detergent, and cloth knotted into wicks.

Early the next morning, Santivanez drove the others to Cruz's house at 2414 Townbreeze, in San Antonio. The yellow Camaro and a pickup truck belonging to the Cruz family were located out front. Mahan and Little Eddie remained in the car, but the others walked toward the house. Jimenez and Santivanez each carried a Molotov cocktail and a cigarette lighter, while Cortez carried a gun. Cortez fired several shots into the house. Jimenez threw his Molotov cocktail into the master bedroom, where it exploded and started a fire. Santivanez also threw his Molotov cocktail into the master bedroom. Although the wick fell out and burned in the front yard, the remainder of the device added fuel to the bedroom fire. Mahan, now behind the steering wheel, waited for Jimenez, Santivanez, and Cortez to return, and then quickly drove off.

Richard Cruz, Jeremy's father, was set on fire by the Molotov cocktails. His wife Pauline put out the flames on Richard. Richard then rescued his twelve-year-old daughter Karen, and both fled outside. Richard sat in a wading pool, while Karen tried to ease her father's burns by splashing him with water. Although Jeremy, Karen, and Pauline were not injured, Richard died a week later as a result of his burns.

From 1981 until the time of the fire, Richard ran the family business, A-1 Plastering, from a one-room office adjacent to the garage. This office was the company's business address. Business records and smaller supplies were located in the office. Other supplies, like cement, were stored in the garage. In the first nine months of 1993, A-1 Plastering employed six full-time workers and generated gross receipts of $170,000. The business used two pickup trucks and one van, each manufactured in Missouri. Further,

3

A-1 Plastering's regularly used supplies and equipment were all manufactured outside of Texas.

No one was arrested immediately for the firebombing of the Cruz residence. During an interview with San Antonio police officers in November 1993, Jimenez implicated himself in the arson of the Hernandez home, but denied involvement in the Cruz firebombing. In 1994, agents of the Bureau of Alcohol, Tobacco, and Firearms ("ATF") asked to speak to Jimenez, who was then represented by Mr. Richard Langlois. Langlois and the United States Attorney's office reached an agreement by which Jimenez would debrief with the government. According to a transcript of the September 1994 interview, Jimenez again denied involvement in the Cruz arson and reiterated his statements that others were responsible. Following the interview, Jimenez took and failed a polygraph examination.

Richard Cortez died in January 1995. Through March 1995, when a new case agent took charge of the investigation, the government was still unable to make a case against any of the defendants. Jimenez was convicted on August 7, 1995 on the state charges resulting from the Hernandez firebombing. In late 1995 and 1996, agents interviewed Mahan and Little Eddie, who told the story of how Jimenez, Santivanez, and Cortez approached the home, how the first two threw Molotov cocktails, and how Cortez shot into the home. The government convened a federal grand jury, which heard testimony in 1997. After receiving confirmation in early 1998 that the Department of Justice would not authorize the death penalty in this case, the government indicted Jimenez and Santivanez in August 1998.

4

In a superseding indictment dated May 12, 1999, the government added the death-causing element under 18 U.S.C. § 844(i). Before this grand jury, however, ATF Agent Gena Alvarez inadvertently made a brief reference to facts disclosed in Jimenez's 1994 debriefing. In January 2000, shortly before trial, the government dismissed the superseding indictment. A grand jury, which did not hear the reference to Jimenez's debriefing, returned a second superseding indictment against both Jimenez and Santivanez.

Shortly before trial, the government disclosed to the defendants information concerning the mental health history of Little Eddie, one of its chief witnesses. The district court granted the government's *in limine* motion preventing defense counsel from referring to Little Eddie's mental state in opening arguments, and from cross-examining him on his mental health without first receiving permission from the bench. Defense counsel cross-examined Mahan and Little Eddie. They were also permitted to recall Little Eddie during their cases-in-chief, but chose not to call him again.

The jury convicted both defendants on all counts: (1) arson causing death, in violation of 18 U.S.C. § 844(i); (2) use of a destructive device during an arson, in violation of 18 U.S.C. § 924(c); (3) possession of an unregistered destructive device, in violation of 26 U.S.C. § 5861(d); and (4) conspiracy to commit the other offenses, in violation of 18 U.S.C. § 371. Jimenez and Santivanez were sentenced to life imprisonment, plus a mandatory sentence of thirty years, to run consecutively.

## II

We review *de novo* the constitutionality of a criminal statute as applied to a

5

defendant. *United States v. Kallestad*, 236 F.3d 225, 227 (5th Cir. 2000). The Supreme Court recently held that it is not a federal crime to throw a Molotov cocktail into a private home, if the home is not "the locus of any commercial undertaking."[3] Although it may seem inequitable to alter the result simply because the home has a one-room office, the starting point for the analysis is the statutory requirement that the property destroyed be "used in ... any activity affecting interstate or foreign commerce." Despite the Supreme Court decisions in *United States v. Lopez*,[4] and *United States v. Morrison*,[5] the arson of a building – even a private home – containing an active business will often satisfy the constitutional requirement that the arson "substantially affect[ ] interstate commerce." *Lopez*, 514 U.S. at 559, 115 S. Ct. at 1630.

A

18 U.S.C. § 844(i) states, in relevant part:

> Whoever maliciously damages or destroys, or attempts to damage or destroy, by means of fire or an explosive, any building, vehicle, or other real or personal property *used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce* shall be imprisoned for not less than 5 years and not more than 20 years ... and if death results to any person, including any public safety officer performing duties as a direct or proximate result of conduct prohibited by this subsection, shall also be subject to imprisonment for any term of years, or to the death penalty or to life imprisonment.

18 U.S.C. § 844(i) (1994 Supp. II) (emphasis added). The government may establish the requisite federal jurisdictional nexus by proving that the property was either (1) used in,

---

[3] *Jones v. United States*, 529 U.S. 848, 856, 120 S. Ct. 1904, 1910 (2000).

[4] 514 U.S. 549, 115 S. Ct. 1624 (1995).

[5] 529 U.S. 598, 120 S. Ct. 1740 (2000).

6

or (2) used in an activity affecting, interstate commerce.

The Supreme Court's decisions in *Lopez* and *Morrison* illustrate that many federal prosecutions under the latter category – effect on interstate commerce – may be suspect. In *Lopez,* the Court struck down as unconstitutional the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q) (1994). The Court identified three broad categories of activity that Congress may regulate pursuant to its Commerce Clause powers: (1) the channels of interstate commerce, (2) instrumentalities of interstate commerce and things and persons in interstate commerce, and (3) activities having a substantial relation to interstate commerce. *Lopez,* 514 U.S. at 558-59, 115 S. Ct. at 1629-30. Regarding this third category, the Court held that, to be within Congress' Commerce Clause powers, "the regulated activity [must] 'substantially affect[ ]' interstate commerce." *Id.* at 559, 115 S. Ct. at 1630. Rejecting the argument that § 922(q) regulated commercial activity, *Lopez* stated that the statute could not be sustained by considering the activity's aggregate effect on interstate commerce. *Id.* at 561, 115 S. Ct. at 1631.

Five years later, in *Morrison*, the Supreme Court struck down a portion of the Violence Against Women Act, 42 U.S.C. § 13981 (1994). Revisiting *Lopez*'s third category of Commerce Clause regulation – activities substantially affecting interstate commerce – the *Morrison* Court identified four factors informing the constitutional analysis: (1) whether the statute regulates commercial activity, (2) whether the statute contains an express jurisdictional element, (3) whether the statute or its legislative history contains express congressional findings regarding the activity's effect on interstate commerce, and (4) whether the link between the activity and a substantial effect on interstate commerce is

7

attenuated. 529 U.S. at 609-13, 120 S. Ct. at 1749-51 (citations and internal quotation marks omitted). Rejecting the legislative findings that gender-motivated violence substantially affects interstate commerce, the Court stated that Congress may not regulate "noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617, 120 S. Ct. at 1754.

It is undisputed that the instant case turns on whether the property was used in an activity affecting interstate commerce. The district court's jury instructions refer only to "affecting interstate commerce" as the basis for federal jurisdiction. *Cf. United States v. Johnson*, 246 F.3d 749, 750 n.2 (5th Cir. 2001) (per curiam) (stating with respect to another § 844(i) case that "[t]he government did not contend that the building was used in interstate or foreign commerce") (internal quotation marks omitted). Following the Supreme Court's analysis in *Lopez* and *Morrison*, we first consider whether other instances of arson may be aggregated in determining the effect of the arson of the Cruz home on interstate commerce. Second, if aggregation is not permissible, we then consider the effect on interstate commerce of a one-room home office.

B

In *Russell v. United States*, 471 U.S. 858, 105 S. Ct. 2455 (1985), a unanimous Supreme Court held that 18 U.S.C. § 844(i) is constitutional as applied to the arson of a two-unit apartment building. Reviewing the statute's legislative history, the Court summarized Congress's intention as "protect[ing] all business property, as well as some additional property that might not fit that description, but perhaps not every private home." *Id.* at 862, 105 S. Ct. at 2457. The Court stated that real estate rental "unquestionably"

8

affects commerce, because the local rental is part of "a much broader commercial market in rental properties." *Id.*  Relying on *Perez v. United States*,[6] the Court held that because Congress has the power to regulate the class of activities in the rental market, it may regulate individual activity within that class.  471 U.S. at 862, 105 S. Ct. at 2457.

In this circuit, we attempted to harmonize *Russell* with *Lopez* by cabining in some of the possible excesses of federal prosecution under § 844(i).  For example, in *United States v. Corona*, 108 F.3d 565 (5th Cir. 1997), we predicted that the statute would not constitutionally apply to the arson of a private home simply because the home was connected to interstate natural gas lines.  *Id.* at 570.  In *United States v. Johnson*, 194 F.3d 657 (5th Cir. 1999) ("*Johnson I*"), we vacated the guilty plea of a defendant who set fire to and destroyed a Methodist church.  The panel held that the plea's factual basis failed to establish that the church was used in an activity affecting interstate commerce. *Id.* at 662.  Judges Garwood and Barksdale disagreed with the majority opinion, insofar as the district court on remand could consider the aggregate effects of other arsons of noncommercial buildings in determining whether the church was used in an activity affecting interstate commerce.  *Id.* at 665 (Garwood, J., specially concurring).

Last year, in *Jones v. United States*, 529 U.S. 848, 120 S. Ct. 1904 (2000), the Supreme Court considered the applicability of § 844(i) to the arson of an owner-occupied home.  In *Jones*, the government identified three activities of the home purportedly affecting interstate commerce, and therefore supporting the defendant's conviction: (1) the home was used to secure a mortgage from an out-of-state lender; (2) the home was used

---

6  402 U.S. 146, 91 S. Ct. 1357 (1971).

to obtain a casualty insurance policy from an out-of-state firm; (3) the home was connected to out-of-state sources of natural gas. *Id.* at 855, 120 S. Ct. at 1910. Relying on its earlier ruling in *Lopez*, and invoking the rule of lenity, the Court reversed the conviction and interpreted § 844(i) as applying "only [to] property currently used in commerce or in an activity affecting commerce." *Id.* at 859, 120 S. Ct. at 1912.

Eight days after issuing *Jones*, the Supreme Court vacated and remanded *Johnson I*,[7] and in a recent opinion, the panel held that the government may not use aggregation to prove that a firebombed building affects interstate commerce. *United States v. Johnson*, 246 F.3d 749, 752 n.5 (5th Cir. 2001) (per curiam) ("*Johnson II*") (holding that to the extent that it conflicts with Judge Benavides' opinion, Judge Garwood's opinion in *Johnson I* now controls). Consistent with *Johnson II*, the government may not prove a noncommercial building's effect on interstate commerce by aggregating unrelated instances of arson.

C

What remains open for consideration after *Jones* and *Johnson II* is whether a home office satisfies § 844(i)'s requirement that the destroyed property be "used in an activity affecting interstate commerce." *Jones* held that "[t]he proper inquiry ... 'is into the function of the building itself, and then a determination of whether that function affects interstate commerce.'" 529 U.S. at 854, 120 S. Ct. at 1910 (quoting *United States v. Ryan*, 9 F.3d 660, 675 (8th Cir. 1993) (Arnold, C.J., dissenting in part)).[8] Both the Court's and the

---

[7] 530 U.S. 1201, 120 S. Ct. 2193 (2000).

[8] *Ryan*, which was decided over Chief Judge Arnold's panel and en banc dissents, *see* 41 F.3d 361 (8th Cir. 1994), involved the applicability of § 844(i) to the arson of a permanently closed fitness center. A panel of the Eighth Circuit recently granted § 2255 relief to the

statute's language call for an objective analysis.  Accordingly, a jury must determine the building's function, not whether the defendant *knew* of the building's function.[9]

The *Jones* Court suggested that a home office may have a substantial effect on interstate commerce: "The Government does not allege that the Indiana residence served as a home office or the locus of any commercial undertaking."  529 U.S. at 856, 120 S. Ct. at 1910.  In *United States v. Shively*, 927 F.2d 804 (5th Cir. 1991), we upheld the constitutionality of federal arson convictions based on the defendants' destruction of a company vehicle and a home with an office.  There we found it significant that company checks paid for the residence's mortgage and utility bills, that $100,000 in business funds were kept at the residence, and that drivers for the homeowners' trucking company "would frequently stay at the house" during layovers.  *Id.* at 808.  Although *Shively* was decided prior to *Jones*, its functional analysis and weighing of commercial factors remain instructive.

In the instant case, the jury heard significant, unrebutted evidence that the Cruz family's home office was the primary location for their construction business.  As an initial

---

defendant on the basis of the Supreme Court's holding in *Jones*.  *See United States v. Ryan*, 227 F.3d 1058 (8th Cir. 2000).

[9]  We are not persuaded that a defendant need have any knowledge of a building's effect on interstate commerce in order to be convicted under § 844(i).  Any suggestion to the contrary in *United States v. Corona*, 108 F.3d 565, 571 (5th Cir. 1997) is inconsistent with *Jones*, and with this court's holdings regarding similar federal crimes.  *See United States v. Jackson*, 978 F.2d 903, 910-11 (5th Cir. 1992) (holding that the federal kidnapping statute, 18 U.S.C. § 1201(a), requires only that a victim be "willfully transported" in interstate commerce, and "does not require that the defendant move the victim or that the defendant know that the victim will be moved in interstate commerce"); *United States v. Dancy*, 861 F.2d 77, 81 (5th Cir. 1988) (holding that 18 U.S.C. § 922(g), prohibiting certain persons from possessing firearms that have traveled in interstate commerce, does not require that the defendant be aware of the firearm's nexus to interstate commerce).

matter, because A-1 Plastering's address for tax purposes was 2414 Townbreeze, the location of the home, this case is quickly distinguishable from the garden-variety situation of a lawyer or salesperson who occasionally works from home.[10]  A-1 Plastering's gross receipts in 1993 averaged nearly $20,000 per month, and the company paid over $8,000 per month in wages to its employees.  At a more fundamental level, an office building having the same characteristics as the Cruzes' home office – where business records and supplies were stored, where employee paychecks were written and picked up, and where business vehicles occasionally parked overnight – would easily be classified as substantially affecting interstate commerce.  Federal jurisdiction over the firebombing of the Cruz home is not undermined simply because the "locus of [the family's] commercial undertaking," *Jones*, 529 U.S. at 856, 120 S. Ct. at 1910, was a private home.

D

What remains is the equitable argument presented by Jimenez and Santivanez, that they had no reason to believe that the Cruz home contained an office.  In this view, a quiet street lined with single-family homes becomes a trap for the unwary firebomber.  But this analysis ignores the other side of the equation.  Several defendants who burned down commercial buildings have benefitted by those buildings' lack of economic viability.  In one case, a defendant who set fire to an abandoned fitness center had his conviction overturned, because the court held that a completely abandoned building has no

_____

[10]  The Eleventh Circuit has held that a homeowner's personal computer failed to have a substantial effect on interstate commerce, because the computer was used for business purposes only once per week.  *See United States v. Denalli*, 73 F.3d 329, 330-31 (11th Cir. 1996).  *Denalli* differs in kind from both *Shively* and the instant case.

substantial nexus to interstate commerce. *See United States v. Ryan*, 227 F.3d 1058, 1063-64 (8th Cir. 2000). In another case, a defendant escaped the application of § 844(i) because, even though she knew the house was rented to tenants, the house was vacant and uninhabitable at the time of the arson. *See United States v. Gaydos*, 108 F.3d 505, 511 (3d Cir. 1997). It would be inconsistent to reward the defendants in *Ryan* and *Gaydos* – who had the good fortune of setting fire to buildings that were not commercially viable – but not to punish defendants who inadvertently destroy a commercially viable office located in a private home.

### III

Akin to Jimenez's and Santivanez's Commerce Clause challenge is their contention that the district court's jury instructions failed adequately to inform the jury on the interstate commerce element. The Federal Rules of Criminal Procedure provide that a party may not complain of an error or omission in the court's jury instructions without first objecting to the instruction, "stating distinctly the matter to which that party objects and the grounds of the objection." Fed. R. Crim. P. 30. Long-standing precedent teaches that we will not ordinarily consider arguments not fully raised below. *See Hormel v. Helvering*, 312 U.S. 552, 556, 61 S. Ct. 719, 721 (1941). When a defendant fails to object to an instruction, or if he urges a different ground for the objection on appeal than before the district court, we review for plain error. *United States v. Heath*, 970 F.2d 1397, 1407 (5th Cir. 1992).

The district court instructed the jury that "the government need only establish a minimal connection between the building or property at issue and interstate commerce." Jimenez and Santivanez objected to this sentence of the instructions, and in particular to

13

the word "minimal." Although the defendants had previously moved to dismiss the indictment on the ground that the Cruz home had an insubstantial effect on interstate commerce, the basis for their objection to the jury instruction was not that the sentence misstated the law. Rather, the defendants objected because, in their view, this sentence commented on the weight of the evidence. The district court therefore had no opportunity to consider the constitutional effect of the objected-to language. *Cf. United States v. Jennings*, 195 F.3d 795, 801 (5ᵗʰ Cir. 1999) (considering, in a Hobbs Act prosecution, the effect of an instruction requiring "an effect," rather than a "substantial effect," on interstate commerce).[11] Accordingly, we review for plain error.

Under the plain error analysis, the court may reverse a criminal conviction only if (1) there was error, (2) the error was clear and obvious, and (3) the error affected a substantial right. *United States v. Olano*, 507 U.S. 725, 732, 113 S. Ct. 1770, 1776 (1993); Fed. R. Crim. P. 52(b). Further, because review of plain error is permissive, rather than mandatory, we exercise our discretion to reverse a conviction only if the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Id.* (alteration in original) (citations and internal quotation marks omitted); *United States v. Slaughter*, 238 F.3d 580, 584-85 (5ᵗʰ Cir. 2000).

Jimenez's and Santivanez's challenge fails on the third element of the *Olano* test, because the word "minimal" did not affect a substantial right. A criminal defendant

---

[11] *See also Rizzo v. Children's World Learning Centers, Inc.*, 213 F.3d 209, 212 & n.1 (5ᵗʰ Cir. 2000) (en banc) (holding that a defendant, by requesting a special interrogatory regarding the defendant's affirmative defense, did not preserve the issue of whether the trial court improperly instructed the jury on the defendant's burden of proof).

ordinarily bears the burden of proving that the error "must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734, 113 S. Ct. at 1778. In *United States v. Garcia Abrego*, 141 F.3d 142, 166 (5th Cir. 1998), we rejected the contention that the court's continuing criminal enterprise ("CCE") instruction prejudiced a defendant by suggesting, theoretically, that the defendant could be an organizer of persons who were not his supervisees. Because the government's case established that the defendant supervised a large number of persons, and because the government did not argue that the jury should convict the defendant based on buyer-seller relationships, we held that no substantial right was affected by the jury instruction. *Id.*

Even if a jury instruction entirely omits an element of the offense, we will affirm unless the defendant proves that the instruction contributed to his conviction. In *United States v. Slaughter*, 238 F.3d 580 (5th Cir. 2000), the defendant was convicted on various narcotics distribution charges. Four counts of the defendant's indictment alleged the type and quantity of narcotics involved, but as to three of these counts, the district court's jury instructions omitted the quantity. *Id.* at 583. Noting that the jury had the indictment during deliberations, the court refused to find that a rational jury could conclude that the quantities stated in the indictment were incorrect. *Id.* at 584.

The instant case is governed by *Garcia Abrego* and *Slaughter*. The government introduced substantial evidence that supplies, materials, and vehicles owned by A-1 Plastering traveled in interstate commerce. The defendants, during their closing arguments, never disputed the company's interstate effects. Even if the word "minimal" negated entirely the element of interstate commerce, we will affirm the convictions unless

15

Jimenez and Santivanez can prove that the instruction was prejudicial, and therefore affected a substantial right. Because the evidence could not permit a rational jury to find that the Cruzes' home did not affect interstate commerce, any error below did not affect a substantial right.[12]

**IV**

Jimenez and Santivanez challenge the trial court's exclusion of proposed testimony concerning zoning variances and neighborhood characteristics. They also argue that the court improperly granted the government's *in limine* motion concerning Little Eddie's mental health records, and unfairly limited their ability to impeach him on his mental health history. We review the trial court's evidentiary rulings, including the decision to exclude relevant evidence pursuant to Federal Rule of Evidence 403, for an abuse of discretion. *United States v. Sprick*, 233 F.3d 845, 852 (5th Cir. 2000).

A

Jimenez offered the testimony of Martin Rodriguez, an employee of the City of San Antonio, to show that, in 1993, the Cruz's neighborhood was not zoned for businesses, and that their home had not received a zoning variance. Citing a lack of relevance, the trial court excluded Rodriguez's testimony.

No court has ever required that a business be lawfully zoned in order to satisfy § 844(i)'s interstate commerce requirement. In *United States v. Barton*, 647 F.2d 224 (2d Cir. 1981), the Second Circuit upheld federal arson convictions for defendants who had

---

[12] Because we hold that no substantial right was affected, we express no view on whether the instructions were erroneous.

bombed illegal gambling clubs. *See id.* at 232 ("the principal commercial activity was the gambling"). The result in *Barton* persuades us to find no error here. Because the interstate commerce element necessitates a functional analysis, Rodriguez's proposed testimony regarding zoning was not relevant to whether the Cruz home substantially affected interstate commerce. Furthermore, the issue of whether an improperly zoned business falls under the purview of 18 U.S.C. § 844(i) is a legal question for the court, not a fact issue for the jury. Therefore the proposed zoning testimony, even if relevant, would be unduly confusing and misleading to the jury under Fed. R. Evid. 403. The district court did not abuse its discretion by excluding Rodriguez's testimony.

B

Prior to trial, the government filed a motion *in limine*, requesting that counsel for Jimenez and Santivanez not refer in their opening arguments to Little Eddie's mental health. Granting this motion, the district court ordered that during opening argument, "[t]he parties ... not discuss the mental condition of any witness unless they are prepared to show that the condition existed during the time frame of the events relevant to this case." During the course of the trial, the court considered the admissibility of Little Eddie's mental health records, and whether Jimenez and Santivanez could impeach Little Eddie about the facts contained therein.[13]

Reviewing the mental health records *in camera*, the court determined that the records primarily concerned periods of time well before and well after the 1993

---

[13] Pending review of the records, the court prohibited defense counsel from questioning Little Eddie about his mental health. (Tr. 614, 688).

17

firebombing, and did not cast doubt on Little Eddie's willingness to tell the truth.  (Tr. 718-19, 734, 902).  While sealing the mental health records, the court stated that they would "be part of the appellate record."  (Tr. 737).  The court made further reference to the records' admissibility being subject to appellate review.  (Tr. 738, 901).  Counsel for Jimenez and Santivanez cross-examined Little Eddie extensively, but regarding the mental health records, they were permitted to inquire only into issues such as previous drug use and overdoses.  (Tr. 732-34, 737-38).

1

At trial, Jimenez and Santivanez did not make an offer of proof regarding their proposed impeachment, based on mental health records, of Little Eddie.  In the usual case, we would not consider their claim that the trial court improperly excluded the records and related testimony.  *See United States v. Winkle*, 587 F.2d 705, 710 (5th Cir. 1979) (stating that the court "will not even consider the propriety of the decision to exclude the evidence at issue, if no offer of proof was made at trial"); Fed. R. Evid. 103(a).  Objecting to an *in limine* order excluding testimony or evidence does not relieve a party from making an offer of proof.  *See United States v. Estes*, 994 F.2d 147, 149 (5th Cir. 1993) (holding that defendant's failure to offer, at trial, a witness's prior conviction was not excused, even though the district court had previously granted the government's *in limine* motion to exclude the conviction).

On the other hand, a party's offer of proof need not be formal.  *See Winkle*, 587 F.2d at 710.  We have also stated that, in general, "excluded evidence is sufficiently preserved for review when the trial court has been informed as to what counsel intends to

18

show by the evidence and why it should be admitted, and this court has a record upon which we may adequately examine the propriety and harmfulness of the ruling." *United States v. Ballis*, 28 F.3d 1399, 1406 (5ᵗʰ Cir. 1994). The latter rule has particular force when the trial court makes clear that it does not wish to hear further argument on the issue. *See id.* at 1406-07 (noting that the district court had twice admonished counsel not to "spoon feed" the court regarding the defendant's debriefing with the government).

In the instant case, the district court did not prevent counsel from making an offer of proof, but explained after its *in camera* review that Little Eddie's mental health records were not admissible. Upon sealing the records, the court repeatedly stated that the defendants' objections were preserved for appeal. Based on this record, we conclude that the district court was adequately informed of the reasons for which counsel wished to impeach Little Eddie concerning his mental health.

2

In reviewing the sealed exhibits, we are mindful that a defendant has "the right to attempt to challenge [a witness's] credibility with competent or relevant evidence of any mental defect or treatment at a time probatively related to the time period about which he was attempting to testify." *United States v. Partin*, 493 F.2d 750, 763 (5ᵗʰ Cir. 1974). To be relevant, the mental health records must evince an "impairment" of the witness's "ability to comprehend, know, and correctly relate the truth." *Id.* at 762.[14]

---

[14] *Partin* correctly states that offering the records for impeachment purposes, rather than as "evidence in chief," weighs in favor of admissibility. 493 F.2d at 764. But whether offered for substantive or impeachment purposes, the mental health records must be relevant, and their probative value must not be substantially outweighed by the danger of unfair prejudice. Fed. R. Evid. 401, 403; *cf. United States v. Abel*, 469 U.S. 45, 50-51, 105 S. Ct.

No rule outlines with precision the severity and timing that make a witness's mental illness relevant for impeachment purposes. But the decisions of this and other circuits stand for the general principle that a diagnosis of schizophrenia or a psychosis will be relevant, unless the diagnosis is too remote in time from the events alleged in the indictment. *Compare Partin*, 493 F.2d at 764 (witness diagnosed with schizophrenia six months prior to the defendants' Hobbs Act violations), *Greene v. Wainwright*, 634 F.2d 272, 274, 276 (5th Cir. 1981) (witness was allegedly involved in "certain bizarre criminal actions ... such as shooting out the windows of a bar," during the "same general time period as the [defendant's] marijuana sale"); *United States v. Society of Indep. Gasoline Marketers*, 624 F.2d 461, 467 (4th Cir. 1979) (witness hospitalized for schizophrenia, manic depression, and delusions during the time of defendants' Sherman Act violations); and *United States v. Lindstrom*, 698 F.2d 1154, 1164-67 (11th Cir. 1983) (witness diagnosed with paranoia and schizophrenia during the time of defendants' conspiracy) *with United States v. Diecidue*, 603 F.2d 535, 551 (5th Cir. 1979) (witness committed twelve years prior to defendants' conspiracy, but never again treated for mental illness).

For witnesses whose mental history is less severe, district courts are permitted greater latitude in excluding records and limiting cross-examination. *See United States v. Sasso*, 59 F.3d 341, 347-48 (2d Cir. 1995) (affirming limit on cross-examination of witness who was depressed and took Prozac and Elovil shortly before the time of the defendants' firearms smuggling conspiracy); *United States v. Butt*, 955 F.2d 77, 83 (1st Cr.

---

465, 468-69 (1984) (holding that the Federal Rules of Evidence permit the impeachment of a witness by showing bias).

1992) (affirming exclusion of records and expert testimony, and limit on cross-examination of a witness who once attempted suicide, but was never diagnosed with a mental illness); *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991) (affirming limit on cross-examination of witness who saw a therapist after the death of her child, and ten years prior to the embezzlement conspiracy). Moreover, none of the cited cases involve adolescent witnesses, among whom depression and suicidal tendencies may be less indicative of severe mental incapacity.

In the instant case, the district court reviewed Little Eddie's mental health records, then gave the parties time to uncover the following facts. Beginning while he was in sixth grade, Little Eddie was diagnosed with conduct and hyperactivity disorders. In September 1990, in a confrontation with his mother over going to school, Little Eddie became verbally abusive, broke a dresser mirror, and threatened to kill himself. He was admitted to the San Antonio State Hospital for two weeks, during which time he was prescribed with an anti-depressant medication. In early 1991, Little Eddie repeatedly refused to take his medication, and twice attempted suicide. He was again admitted in October 1991, but soon released because his depression was under control, and he showed no further suicidal tendencies, nor any signs of psychosis. While in criminal detention in 1994, Little Eddie stated that he almost overdosed on cocaine one or two years before, and though he was still depressed at the time of his detention,[15] he appeared coherent and stable. Finally, in October 1997, over four years after the firebombing at issue in this case, Little

---

[15] The examination notes state that Little Eddie "fe[lt] bad" after his father passed away in April 1994.

Eddie threatened to jump off a highway overpass. On being admitted to a local mental health facility, he claimed that he wanted to see his child. Little Eddie was treated for ten days, then upon exhibiting no further signs of dangerousness, and agreeing to seek counseling, he was released.

After carefully reviewing the sealed exhibits, we find that there is only a tenuous argument that Little Eddie suffered from an impairment affecting his ability to comprehend and tell the truth. He was never diagnosed with a psychosis. Further, although Little Eddie's self-destructive behavior arguably overlapped with the 1993 firebombing of the Cruz home, it is important to remember that he was between fourteen and fifteen years old at the time of his two known suicide attempts. Finally, the 1997 incident appears entirely unrelated to his behavior of six and seven years before. Little Eddie was extensively cross-examined by counsel for Jimenez and Santivanez regarding his drug use, criminal activity, and allegedly inconsistent statements to police. The district court also permitted counsel to inquire into issues such as his drug overdose. We cannot say that these limitations denied Jimenez and Santivanez their Sixth Amendment right adequately to confront Little Eddie.[16] Therefore we find no abuse of discretion.

## V

There is no allegation before us that the prosecutions of Jimenez and Santivanez

---

[16] Although the appellants' brief recites a number of inconsistencies between the testimony of government witnesses Little Eddie and Brian Mahan, it ignores the fact that counsel cross-examined both witnesses at length on these matters. Little Eddie's credibility is a quintessential jury issue.

failed to satisfy the relevant statutes of limitation.[17] For pre-indictment delay to violate the Due Process clause of the Constitution, a defendant must show both actual and substantial trial prejudice, and intentional delay by the government for a bad faith purpose. *United States v. Crouch*, 84 F.3d 1497, 1500 (5th Cir. 1996) (en banc). Prior to trial, Jimenez moved to dismiss the indictment against him on grounds of prejudicial pre-indictment delay.[18] Finding that Jimenez failed to show prejudice, the court below refused to consider the purpose for the delay, and denied the motion to dismiss. We review the district court's factual determinations for clear error. *Id.* at 1523; *United States v. Beszborn*, 21 F.3d 62, 66 (5th Cir. 1994).

The firebombing of the Cruz home occurred on September 8, 1993, and the first indictment against Jimenez was returned on August 5, 1998. On appeal, Jimenez indicates that two factors establish prejudice in his case. First, he argues that, had the government indicted him prior to his twenty-first birthday, he would have been prosecuted as a juvenile. Second, he argues that Richard Cortez, who died in January 1995, would have provided crucial testimony.

Jimenez's first ground for finding prejudice concerns the applicability of the Juvenile Delinquency Act ("JDA"), 18 U.S.C. §§ 5031, *et seq.* (1994). Jimenez argues that, even

---

[17] There is no statute of limitations on the § 844(i) charge, because Richard Cruz's death makes it a capital offense. 18 U.S.C. § 3281. As to the non-capital charges, the August 8, 1998 indictment satisfies the five-year statute of limitations. 18 U.S.C. § 3282.

[18] Santivanez failed to file a motion to dismiss prior to trial, thus waiving this issue for purposes of his appeal. *See* Fed. R. Crim. P. 12(b)(1).

23

though the JDA does not technically apply to him,[19] he would have benefitted from its provisions had the government indicted him more promptly. On this question, we find instructive the Second Circuit's decision in *United States v. Hoo*, 825 F.2d 667 (2d Cir. 1987). The defendant in *Hoo* was charged, only two weeks following his twenty-first birthday, with operating a RICO enterprise, and with seven acts of racketeering, including conspiracy to commit murder, attempted murder, and murder. *Id.* at 668. The defendant moved to dismiss the indictment, and at an evidentiary hearing prior to trial, the government stated that until the day before the defendant's twenty-first birthday, it lacked "the most important evidence against him" – a cooperating witness's testimony about the defendant's participation in a murder. *Id.* at 669. The court of appeals held that the defendant failed to show that the government's delay was the result of an improper prosecutorial motive. *Id.* at 671.

The instant case admittedly differs from *Hoo* because Jimenez was not indicted immediately after the government's debriefing of Mahan and Little Eddie. But a critical factor cuts sharply against Jimenez's claim of prejudicial delay: until March 8, 1999, the government had no reason to believe that the JDA might apply. Prior to that date, when they received notice from Jimenez's counsel concerning Jimenez's date of birth, prosecutors were unaware that he was 17 years old at the time of the firebombing. At the

---

[19] We have not previously considered the applicability of the JDA to defendants who commit crimes before their eighteenth birthdays, but who are indicted after reaching the age of twenty-one. Those circuits that have addressed this issue agree that the JDA is inapplicable under these circumstances. *See United States v. Hoo*, 825 F.2d 667, 669-70 (2d Cir. 1987); *United States v. Araiza-Valdez*, 713 F.2d 430, 432-33 (9th Cir. 1980); *United States v. Delatorre*, 157 F.3d 1205, 1209 n.2 (10th Cir. 1998); *In re Martin*, 788 F.2d 696, 697-98 (11th Cir. 1986); *United States v. Thomas*, 114 F.3d 228, 264 (D.C. Cir. 1997).

time of the August 1998 indictment, only one document in the government's files indicated Jimenez's correct date of birth of April 7, 1976; numerous other documents, including those provided by the Texas Department of Corrections, erroneously listed his date of birth as April 7, 1974 or April 7, 1975.[20]  According to either of the erroneous dates, Jimenez would have been an adult at the time of the Cruz firebombing.  The government therefore had no reason at the time to believe it should pursue the arson and firearms charges against Jimenez under the JDA.

Moreover, even if the government had realized Jimenez's true date of birth prior to his twenty-first birthday, April 7, 1997, the JDA expressly requires the government to transfer Jimenez for prosecution.  Section 5032 mandates that "a juvenile who is alleged to have committed an act after his sixteenth birthday" described in 18 U.S.C. § 844(i), "and who has previously been found guilty of ... an offense in violation of a State felony statute" equivalent to § 844(i), "*shall be transferred* to the appropriate district court of the United States for criminal prosecution."  18 U.S.C. § 5032 (emphasis added).  Following his August 7, 1995 state conviction for the Hernandez firebombing, it was a foregone conclusion that Jimenez be transferred in connection with the Cruz firebombing.

Mahan and Little Eddie, the cooperating witnesses in this case, did not debrief with the government until after August 7, 1995.[21]  We therefore agree with the government that

---

[20]  The Texas Department of Corrections, which has held Jimenez in custody since November 1993, erroneously lists his birth date as either April 7, 1974 or April 7, 1975.  The San Antonio Police Department, in several reports regarding Jimenez, erroneously lists his birth date as April 7, 1975.

[21]  Mahan and his counsel signed the government's Rule 11 letter on August 11, 1995. Little Eddie and his counsel signed the government's Rule 11 letter on September 10, 1996.

there was no indictable case against Jimenez until at least August 11, 1995, and that any subsequent delay in indicting him cannot therefore be prejudicial.

*A fortiori*, Jimenez's second ground for finding prejudice fails. Richard Cortez, who was a Klan leader and who fired gunshots into the Cruz home, died in January 1995, months before Mahan and Little Eddie agreed to cooperate with the government. Therefore even the speculative prejudice to Jimenez,[22] cannot be attributed to the government. The district court did not clearly err in finding that Jimenez's due process rights were not prejudiced by the government's August 5, 1998 indictment.

## VI

In *Kastigar v. United States*, 406 U.S. 441, 92 S. Ct. 1653 (1972), the Supreme Court upheld the constitutionality of 18 U.S.C. § 6002, which grants use and derivative-use immunity to federal witnesses. Although the statute does not grant "absolute immunity against future prosecution," *id.* at 451, 92 S. Ct. at 1660 (quoting *Counselman v. Hitchcock*, 142 U.S. 547, 586, 12 S. Ct. 195, 206 (1892)), the Court held that the use- and derivative-use protection is "coextensive with the [Fifth Amendment] privilege ... and is all that the Constitution requires." *Id.* at 459, 92 S. Ct. at 1664. Federal Rule of Criminal Procedure 11(e)(6) similarly provides that, with limited exceptions, statements made by a defendant during plea discussions with the government are inadmissible. Fed. R. Crim. P. 11(e)(6)(D).

Prior to trial, Jimenez moved to dismiss the indictment, alleging that the government

---

[22] Jimenez fails to suggest, before the district court below, and now before us, how Cortez would have provided crucial testimony. We note that Cortez's death allowed Jimenez, at trial, to shift the blame for the Cruz firebombing.

26

had violated an agreement not to prosecute him. Following a hearing on this matter, the district court rejected Jimenez's claim as based solely on the subjective belief of Jimenez's then-counsel. The district court further held that the government's prosecution against Jimenez was not tainted by Jimenez's 1994 statement to ATF agent Carla Bell. We review the district court's factual determinations for clear error. *United States v. Williams*, 859 F.2d 327 (5th Cir. 1988) (per curiam).

A

A defendant who claims that he has received transactional immunity asserts, in essence, the existence of an agreement not to prosecute. As we held in *United States v. Castaneda*, 162 F.3d 832 (5th Cir. 1998), "[n]onprosecution agreements ... are contractual in nature, and are therefore interpreted in accordance with general principles of contract law." *Id.* at 835. Such an agreement may be either express or implied. Applying contract law, the defendant bears the burden of proving that there was a mutual manifestation of assent – either verbally, or through conduct – to the agreement's essential terms. *See, e.g.*, *United States v. McHan*, 101 F.3d 1027, 1034 (4th Cir. 1996) (citing Restatement (Second) of Contracts § 19 (1979)).[23] The court must evaluate both subjective and objective factors in determining whether the defendant has carried his burden. *United States v. Robertson*, 582 F.2d 1356, 1366 (5th Cir. 1978) (en banc).

The testimony and exhibits at the pretrial hearing established that on July 20, 1994,

---

[23] Jimenez argues that, in order to prosecute him, the government must prove that Jimenez breached the alleged immunity agreement. This rule only applies, however, if Jimenez first proves that such an agreement existed. *See United States v. Cantu*, 185 F.3d 298, 302 (5th Cir. 1999); *Castandea*, 162 F.3d at 836.

the government, through Assistant United States Attorney David M. Shearer, sent Jimenez's counsel, Richard E. Langlois, a letter proposing to meet with Jimenez regarding his involvement in the Cruz firebombing. This letter stated, in part, that the meeting would be governed by "Rule 11 of the Federal Rules of Criminal Procedure," and that pursuant to Rule 11(e), "any statement which Jiminez [sic] makes in this meeting will not be used against him in a future prosecution ...." Langlois and Jimenez signed this letter, indicating their agreement with its terms. Jimenez was then interviewed by ATF agent Carla Bell on September 6, 1994.

Assuming *arguendo* that Jimenez's September 1994 debriefing with the government constituted a plea discussion for purposes of Rule 11,[24] we find no evidence supporting Jimenez's assertion that the government agreed not to prosecute him. Mr. Langlois's letter of August 26, 1994, in which he indicated Jimenez's willingness to debrief with the government, does not discuss immunity at all. As Mr. Langlois admitted at the hearing, he and the government agents never directly discussed transactional immunity for Jimenez; Langlois believed the distinction between use and transactional immunity to be "an afterthought." Based on these facts, we cannot find that the district court clearly erred in determining that the government offered Jimenez only use immunity.[25]

B

---

[24] *Cf. United States v. Robertson*, 582 F.2d 1356, 1365 (5th Cir. 1978) (en banc) (noting that "not every discussion between an accused and agents for the government is a plea negotiation").

[25] We find no merit in Jimenez's argument that, by agreeing to undergo a polygraph examination, he must have believed that he would not be prosecuted. His subjective belief cannot, by itself, establish transactional immunity.

Secondly, we consider whether Jimenez's 1994 debriefing contributed, either directly or indirectly, to the government's case against him. In a taint hearing (commonly referred to as a "*Kastigar* hearing"), the government must demonstrate that it used nothing from the defendant's immunized testimony, either directly as evidence, or indirectly as an investigatory lead. *Kastigar*, 406 U.S. at 460, 92 S. Ct. at 1665. The government satisfies this burden by proving by a preponderance of the evidence "that the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." *Id.* We review the district court's factual findings for clear error.[26]

In reviewing the conduct of a *Kastigar* hearing, we have rejected the approach of another circuit that "constitutionalizes elements of the *Kastigar* process." *United States v. Cantu*, 185 F.3d 298, 304 (5th Cir. 1999).[27] Although the government must "give the defendant a chance to cross-examine relevant witnesses, ... the focus of the ... inquiry should remain on whether the evidence was tainted, and not on the procedures by which the court comes to this conclusion." *Id.* For example, the government may submit post-hearing documents supporting a witness's testimony. *Id.*

Jimenez claims that because his debriefing conversation was tape-recorded, and because the government conceded that it has lost the tape,[28] the government failed to

---

[26] *Cf. Cantu*, 185 F.3d at 302 ("The district court did not make any factual findings; therefore we review Cantu's claim *de novo*.").

[27] In *United States v. North*, 920 F.2d 940 (D.C. Cir. 1990), the District of Columbia Circuit held that in conducting a *Kastigar* hearing, the district court may not substitute an *in camera* review for a hearing in which the defendant is permitted to cross-examine witnesses. *Id.* at 944.

[28] The government notified Jimenez in September 1998 that it had lost the tape recording of the debriefing.

carry its burden of showing that the subsequent prosecution was not tainted. At the pretrial hearing, the government submitted a handwritten transcript of Jimenez's debriefing. ATF agent Carla Bell wrote this transcript while listening to the tape at some time prior to March 1995. The government did not call Bell to testify at the hearing, but authenticated the transcript through ATF agent Gena Alvarez, who testified that she is familiar with Bell's handwriting.

We have not yet determined the extent to which the Federal Rules of Evidence apply to *Kastigar* hearings. Nor need we do so in this case. Because the original recording has been lost or destroyed, the transcript would ordinarily be admissible as "other evidence of the contents." Fed. R. Evid. 1004(1). Moreover, the potential hearsay problem must be balanced against the proper focus of the *Kastigar* hearing: whether the government's evidence was tainted. As the district court noted, Jimenez never contradicted Alvarez's testimony that the transcript was accurate. Jimenez in fact admits that his 1994 interview revealed "all of the same facts, leads, names and events contained" in his 1993 statement to Texas authorities.[29] There was no clear error in the district court's finding that Jimenez's prosecution was untainted by his 1994 debriefing.

**VII**

A sentencing court's decision not to depart downward is reviewable only if "the refusal to depart 'is premised upon the ... court's mistaken assumption that the Guidelines do not permit such a departure.'" *United States v. Dadi*, 235 F.3d 945, 954 (5th Cir. 2000)

---

[29] Significantly, Jimenez's 1993 statement to the San Antonio Police Department – which consists primarily of his denial of wrongdoing in the Cruz firebombing – was made voluntarily, and unlike his 1994 statement, is not immunized.

(quoting *United States v. Powers*, 168 F.3d 741, 753 (5th Cir. 1999)). Jimenez does not contend that the district court believed it had no authority to depart on the basis of Jimenez's age at the time of the Cruz firebombing. Therefore we lack jurisdiction to entertain this argument.

## CONCLUSION

For the reasons stated, we AFFIRM the convictions and sentences in this case.