*Pascal S. Nensala v. State of Maryland*, No. 703, September Term, 2024. Opinion by Eyler, J. Filed February 2, 2026.

**CONSTITUTIONAL RIGHT OF CONFRONTATION — CROSS-EXAMINATION — RELEVANCE OF STATE'S PRIMARY WITNESS'S MENTAL DISORDER TO CREDIBILITY — ATTACK ON CREDIBILITY BASED ON IMPAIRMENT OF WITNESS'S ABILITY TO ACCURATELY PERCEIVE AND RECALL REALITY AT THE TIME OF THE CRIME — MD. RULE 5-616 — DEFENSE PROFFER MUST REST ON FACTUAL FOUNDATION THAT VICTIM WAS SUFFERING FROM MENTAL DISORDER IN QUESTION AT THE RELEVANT TIME AND THAT DISORDER WAS SUCH AS TO IMPAIR VICTIM'S ABILITY TO ACCURATELY PERCEIVE AND RECALL REALTY.**

While in his office at his place of work, the victim was confronted by an assailant who stabbed him in the chest twice. The assailant tried to stab him a third time but the victim managed to get away and run outside, where people came to his aid. The victim told responding police officers that the appellant had stabbed him. The appellant, the victim, and the victim's wife had worked in the same office for many years, until soon before the stabbing, and were friends. The victim and his wife were going through a divorce, and the victim suspected, correctly, that his wife and the appellant were having an affair. The victim was transported to a hospital where he underwent surgery for multiple stab wounds to his lungs.

The appellant was charged with several crimes, including attempted first-degree and second-degree murder. Only the assailant and the victim witnessed the stabbing. The victim was the State's primary witness at trial. He testified about the stabbing and that the appellant was the person who had stabbed him. The appellant pursued a defense of lack of criminal agency, theorizing that someone else had stabbed the victim and the victim had imagined that the appellant had been the stabber. On cross-examination, he sought to impeach the victim's credibility by questioning him about his mental health history, particularly that he had been diagnosed with bipolar disorder. Defense counsel proffered that the victim had been diagnosed with that disorder and was on medication for it. The State objected on the ground of relevancy. The court ruled that the defense could not pursue that line of inquiry on cross-examination.

The appellant was convicted on all counts and on appeal contended that the court's ruling was in error, that the evidence was legally insufficient to prove intent to kill and premeditation and deliberation, and that the court plainly erred in sentencing him.

*Held:* Judgments of the circuit court affirmed. The appellant sought to impeach the victim's credibility by showing that his mental disorder impaired his ability to perceive the stabbing event, causing him to hallucinate or suffer a delusion that the appellant was the stabber when he was not. To cross-examine the victim for that purpose, the appellant

needed to proffer a factual foundation for the assertion that the victim had the mental disorder in question and that the mental disorder could seriously impair the victim's ability to perceive and accurately recall reality. There was an adequate factual foundation for the proffer that the victim suffered from bipolar disorder. The appellant did not proffer that the victim's bipolar disorder could have seriously impaired his ability to perceive reality during the stabbing.  Generally, in cases throughout the country in which cross-examination of a witness about his or her mental disorder has been permitted as an attack on the witness's credibility, the mental disorder has been one such as schizophrenia, where psychosis manifesting in hallucinations or delusions is a feature.  The cases in which bipolar disorder was the mental disease in question have not permitted cross-examination for that purpose. Bipolar disorder is a mood disorder and ordinarily does not have psychosis as a feature. To be relevant, a proffer would have to show not only that the witness suffered from bipolar disorder but also that he or she had suffered psychotic features to the disorder and was experiencing psychotic features at the relevant time.  Because there was no such proffer, the fact that the victim in this case had been diagnosed with bipolar disorder was not relevant to his credibility.  Even if it had been, which it was not, there was ample reason for the court to conclude that cross-examination on that topic would be unduly prejudicial.

The evidence that the appellant stabbed the victim in the chest, where vital organs are located, was sufficient to allow a reasonable jury to find that the appellant acted with the intent to kill. There also was sufficient evidence of premeditation and deliberation. Finally, the sentencing court did not err or abuse its discretion in hearing information about a rejected plea deal by the appellant and in considering whether the victim's wife was being honest with the court in presenting herself solely in the role of therapist, when she was part of the love triangle underlying the crimes.  Without error or abuse of discretion there could be no plain error.

Circuit Court for Prince George's County
Case No.: C-16-CR-23-000157

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 703

September Term, 2024

_____

PASCAL S. NENSALA

v.

STATE OF MARYLAND

_____

Leahy,
Zic,
Eyler, Deborah S.
    (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: February 2, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

We hold in this case that the Circuit Court for Prince George's County did not improperly limit cross-examination of the State's primary witness, M.B., on the topic of his mental health history.[1] M.B. was stabbed while at his place of work in Lanham. Pascal S. Nensala, the appellant, was indicted for attempted first-degree murder, attempted second-degree murder, first-degree assault, and second-degree assault in the stabbing. A jury convicted him on all counts. After the court sentenced him to fifty years in prison with all but twenty years suspended for attempted first-degree murder, he timely appealed, posing the following questions for review, which we have rephrased slightly:

> I. Did the trial court commit reversible error by denying cross-examination of M.B. about his mental health history?
>
> II. Was the evidence legally sufficient to support the attempted murder convictions?
>
> III. Did the sentencing court plainly err by focusing on an impermissible sentencing consideration and creating an appearance of ill-will toward the defense?

For the following reasons, we shall affirm the judgments of the circuit court.

## FACTS AND PROCEEDINGS

M.B. was stabbed on March 25, 2022, inside his office at Vesta, Inc. ("Vesta"), a community health care provider for people with mental health and substance abuse problems. At various overlapping times, the appellant, M.B., and M.B.'s then-wife, T.C., were employees of Vesta at its Lanham location. The appellant worked in the kitchen for

---

[1] Both parties refer to the victim and his ex-wife, T.C., by their initials. We shall do likewise given the mental health aspect of this appeal.

eleven years, until January 2022. T.C. was a therapist for Vesta. She left that employment sometime before the day of the stabbing. M.B. worked for Vesta as a driver and vehicle mechanic and still held that job at the time of the stabbing. The three had been friends.

Two months before the stabbing, M.B. and T.C. began divorce proceedings, which were contentious. They shared a daughter. Not long before the stabbing, M.B. became suspicious that T.C. was involved in an intimate relationship with the appellant. When he confronted her about that, she denied it. He did not say anything to the appellant about what he suspected.[2]

M.B. had a very small office in the building where Vesta was located, on the first floor. On the day in question, he arrived at work at 9 a.m. and entered through the rear door, swiping his work pass to do so. Due to the continuing Covid-19 pandemic, not many Vesta employees were present, and the surface lot where they parked was sparsely occupied. As M.B. entered the building, he noticed a black Nissan Sentra parked in that lot. Its windows were tinted so he did not see whether anyone was inside it.

About an hour later, M.B. was sitting in his office at his desk getting ready to pay a bill and making a phone call. The appellant walked up to his office door and asked if he was on the phone. M.B. replied that he was and that he was busy, and closed the door. M.B. emailed his divorce lawyer and told him that the appellant was in the building. He did so because he wondered why the appellant would be there at all, given that he no longer worked at Vesta, and how he could have gotten inside.

---

[2] In fact, T.C. was having an affair with the appellant at the time. According to her, their relationship started after she left her position at Vesta but before M.B. was stabbed.

A short time later, there was a knock on M.B.'s office door. M.B. opened it and the appellant walked inside, said, "people are talking[,]" and shut the door behind him. Because the office was so small, the appellant and M.B. were face-to-face. The appellant said, "don't say nothing[,]" removed something from his pants, and started attacking M.B. M.B. realized he was being stabbed and saw the blade of the knife, which he later estimated to be seven inches long. The appellant stabbed him twice in his chest. He tried to stab him in the chest a third time but "it didn't go in" because the blade was hitting his rib. M.B. wrested himself away and ran out of his office, down a hallway, and through the kitchen. From there, he exited a door to the outside, onto the parking lot. He was holding his chest, bleeding, and wheezing because it was hard to breathe. He saw a construction crew and headed to them for help, saying he had been stabbed and "somebody in there is trying to kill me." Members of the crew called 911 and wrapped M.B.'s wounds in items of clothing they retrieved from their vehicles. As that was happening, M.B. saw the appellant exit the Vesta building, get in the black Nissan Sentra, and drive off. M.B. knew that the vehicle the appellant ordinarily drove was a different make, model, and color from the Nissan Sentra. (The Sentra never was located.)

The police arrived quickly. M.B. told them the appellant had stabbed him. M.B. was transported by ambulance to the University of Maryland Capital Region Medical Center ("UM") in Lanham. He had stab wounds to his right and left chest, and "[a]ir [was] bubbling from both chest wounds." The knife had cut into his lungs and caused bleeding inside his chest cavity and broken rib cartilage on the right side.

M.B. was taken to the operating room where surgeons repaired the lacerations to both lungs. He remained hospitalized for two weeks for treatment of his injuries and an infection that developed. Three days into his hospitalization, Sergeant Christopher Harman of the Prince George's County Police Department visited him and showed him a photograph of the appellant. M.B. identified the appellant as the person who had stabbed him.

M.B. was the State's primary witness at trial. He identified the appellant as the person who had stabbed him and testified that they used to be friends and he did not know why the appellant had tried to kill him. M.B.'s hospital records from his admission to UM, comprising 910 pages, were admitted into evidence in their entirety, without objection.

Our summary reflects the evidence adduced in the State's case. The appellant's defense was lack of criminal agency, i.e., that he had not been the person who committed the stabbing. He did not testify or call any witnesses.

We shall include additional facts as relevant to our discussion of the issues.

## DISCUSSION

## I.

On cross-examination, M.B. testified that he was a former participant at Vesta and had received care there for a period of time that he did not specify. He also testified that he met T.C. and the appellant at that time, and that the appellant also was a participant at Vesta. At one point they had roomed together. The following then transpired:

> [DEFENSE COUNSEL]: Okay. All right. When you were a participant, . . . someone receiving treatment at Vesta, you were doing so because you had a mental illness, correct?

4

[PROSECUTOR]: Objection.

THE COURT: Sustained.

BY [DEFENSE COUNSEL]:

Q. Well –

A. Yes.

THE COURT [ADDRESSING M.B.]: When there's an objection, you allow me to rule on the objection. And if I sustain the objection, you can't answer.

BY [DEFENSE COUNSEL]:

Q. Okay. Well, let me ask you this, sir, on March 25th of 2022, were you hearing voices in your head?

A. No.

Q. Okay. Had you previously heard voices in your head and acted upon them?

A. No.

[PROSECUTOR]: Objection.

THE COURT: Sustained.

A bench conference ensued, during which defense counsel argued that questions about M.B.'s mental health should be permitted as they went to his credibility:

[DEFENSE COUNSEL[3]]: Ultimately, somebody's mental state, particularly at the time of the crime, it goes to credibility. The jury doesn't know the gentleman. They don't know his history. They don't know any medications that he was taking or takes now. They don't know anything about his diagnosis. **He's diagnosed as bipolar and he is still bipolar, and**

_____

[3] Although the transcript gives the prosecutor's surname at this point, from what is said, it is clear this portion of the argument was made by defense counsel.

**he still takes medication for it.** Ultimately, it's -- all of the case law is crystal clear that it's fair. It's fair game for a jury's determination of credibility and nothing more.

[PROSECUTOR]: There's nothing relevant about that. If he's bipolar or not, that has nothing to do with his seeing Mr. Nensala stab him. It's done to try to discredit his credibility by trying to make it seem like he is mentally ill and making it up. It's not appropriate.

THE COURT: I find that it's more prejudicial than probative. I'm going to sustain the objection.

(Emphasis added.)[4]

\*\*\*

The appellant contends M.B.'s mental health history was relevant to his credibility as a witness, and therefore, the trial court erred and abused its discretion by prohibiting cross-examination on that topic. The State counters that the appellant failed to adequately proffer evidence about M.B.'s mental health that was relevant to his credibility and, even had he done so, the trial court properly concluded that the probative value of any such evidence was substantially outweighed by its potential for unfair prejudice.[5]

---

[4] In his brief, the appellant notes that, several months before trial, at a pretrial conference before a different judge, the prosecutor mentioned that M.B. has "mental health issues." The context of the discussion was that, although M.B. had been focused on the case initially, he had failed to appear on the first scheduled trial date.

[5] The State also maintains that any error by the trial court was harmless beyond a reasonable doubt. Because we conclude that the court did not err or abuse its discretion, we do not reach the issue of harmless error. *See Baker v. State*, 332 Md. 542, 556 (1993) (declining to "reach the harmless error issue" because the Court did not find any error on the part of the circuit court).

"The Sixth Amendment to the United States Constitution, made applicable to the States through the Fourteenth Amendment . . . provides, in pertinent part, that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him.'" *Langley v. State*, 421 Md. 560, 567 (2011) (quoting U.S. CONST. amend. VI.).[6] Cross-examination is central to the right of confrontation. *See Peterson v. State*, 444 Md. 105, 122 (2015) ("A criminal defendant's right to cross-examine the prosecution's witnesses is protected by the Confrontation Clause that appears in both the federal and State constitutions.").

The right to cross-examination is not limitless, however. *Pantazes v. State*, 376 Md. 661, 680 (2003). "Discovery of irrelevant information is not a proper object of cross-examination." *Grandison v. State*, 341 Md. 175, 206 (1995). "Evidence is relevant or probative if it tends to prove the proposition for which it is offered. The more attenuated the connection between the evidence and the proposition, the less the probative value of the evidence." *Id.* A witness "may be cross-examined on any matter relevant to the issues, and the witness's credibility is always relevant." *Reese v. State*, 54 Md. App. 281, 286 (1983). Although credibility always is relevant, not all evidence is relevant to credibility. Whether evidence is relevant to the proposition it is being offered to prove is a question of law, which we review *de novo*. *Perry v. Asphalt & Concrete Servs. Inc.*, 447 Md. 31, 48 (2016). *See also Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552 (2017).

---

[6] The right of confrontation also is protected by Article 21 of the Maryland Declaration of Rights, which has been interpreted to like effect as the Sixth Amendment. *Derr v. State*, 434 Md. 88, 103 (2013).

When evidence meets the threshold for relevancy, a trial court nevertheless may exercise discretion to limit its use for cross-examination "for witness safety or to prevent harassment, prejudice, confusion of the issues, [or] inquiry that is repetitive or only marginally relevant." *Manchame-Guerra v. State*, 457 Md. 300, 309 (2018) (quotation marks and citations omitted). We review a trial court's discretionary decision for abuse of discretion. *Perry*, 447 Md. at 48.

Maryland Rule 5-616 addresses impeachment by inquiry of a witness or by use of extrinsic evidence. Subsection (a)(5) provides that "[t]he credibility of a witness may be attacked through questions asked of the witness, including questions that are directed at . . . [p]roving . . . weaknesses in the capacity of the witness to perceive, remember, or communicate[.]" Md. Rule 5-616(a)(5). If the witness is examined about an impeaching fact and "has failed to admit it," or if the interests of justice require, extrinsic evidence may be admitted to show the witness's weaknesses in the capacity to "perceive, remember, or communicate[.]" Md. Rule 5-616(b)(4).

***

Three reported Maryland cases have a bearing on this issue.

In *Reese*, 54 Md. App. 281, the defendant and another man were charged with armed robbery of a man the defendant had known for about a year. According to the victim, as he was walking home, the defendant confronted him and pointed a .38 caliber pistol at him,

8

demanding his watch, and the other man hit him in the face with a nunchaku.[7] The victim fell to the ground, and the other man hit him again with the nunchaku. The defendant ordered him to remove his jacket, and the two men took his watch, jacket, shoes, and $9.00. They gave him two minutes to run home or be shot, with the defendant firing the pistol in the air for emphasis. According to the defendant, an encounter with the victim happened, but he did not have a gun and did not touch the victim. The other man carried out the robbery and he (the defendant) merely "set aside" the victim's belongings on the ground. *Reese*, 54 Md. App. at 283 (cleaned up).

The victim was the State's primary witness. Before trial, the defense sought leave of court to cross-examine him about his psychiatric history. That resulted in the State's filing a motion *in limine*, on which the court heard argument. Relying solely on hearsay information, defense counsel proffered that the victim had been a patient at a psychiatric hospital. The court granted the State's motion but agreed to reconsider it upon the availability of psychiatric information from the hospital's files. The court made the circuit court's Medical Administrator available to contact the hospital to obtain its records.

At trial, the defense renewed the request to cross-examine the victim about his psychiatric history. The court called a recess and outside of the presence of the jury heard from the Medical Administrator, who had obtained some of the victim's records from Springfield State Psychiatric Hospital. The Medical Administrator informed the court that

---

[7] A nunchaku is "a weapon of Japanese origin that consists of two sticks joined at their ends by a short length of rawhide, cord, or chain." *Nunchaku*, Merriam-Webster, https://perma.cc/S95H-XUW7. It also is called a "nunchuck." *Id.*

9

the victim had been admitted to that hospital "'at least twelve times in the last several years,'" most recently after the robbery but before trial. *Id.* The victim had been diagnosed with "'mixed emotional disturbance and borderline personality[.]'" *Id.* The Medical Administrator explained, "'[e]ssentially a borderline personality individual is someone who experiences from time to time under stress episodes of psychosis or losing touch with reality and comes back into reality fairly easily.'" *Id.* The Medical Administrator could not say that the victim had had these precise symptoms but opined that "'if [the victim] had been out of touch with reality at the time of the offense he would not be able to recollect issues in any kind of detail.'" *Id.* at 283-84. The trial court declined to permit further inquiry on the issue.[8]

On appeal, we explained that, generally, a defendant may elicit proof that a witness against him is now, or was at a relevant period of time, suffering from a mental disability that reasonably calls into question the witness's ability to observe, recall, or communicate. *Id.* at 289-92. In deciding whether the evidence in question was relevant to that, we focused on the offers of proof made by the defense, observing that, had the sole proffer been the one made pre-trial, which was general and based on hearsay, we might conclude that the trial court's ruling limiting inquiry was proper. We explained:

---

[8] The court informed defense counsel that, if the defendant were found guilty, he could subpoena the full hospital record and move for a new trial. After the guilty verdict, defense counsel did, in fact, obtain the full hospital record, which showed that the victim had "a long history of drug abuse and frequent psychotic episodes" and that, during an earlier admission, he had been "psychotic with bizarre, confused and agitated behavior[.]" *Reese*, 54 Md. App. at 284 (cleaned up). The defense moved for a new trial, which apparently was denied.

10

In determining the relevance of an inquiry into a witness's psychological instability, there is some room for discretion such as defining whether the particular disorder affects factors of credibility like memory, observation, exaggeration, imagination, etc. But even that limited sphere is further restricted by the weight of the evidence so indicating. The proffer need not be that proof beyond a reasonable doubt, or even by a preponderance of evidence, will show that such disorder is or was prevalent. It need only show that inquiry is likely to so divulge such a defect in the witness.

*Id.* at 289. We further explained that, if the evidence proffered is relevant, the trial court must engage in a weighing process:

[A] trial judge in liberally permitting a broad scope of credibility inquiry must balance not only the waste of judicial time factor (as was implicit here) against the value of exploration, but must take particular care not to permit annoying, harassing, humiliating and purely prejudicial attacks unrelated to credibility. Like bad acts, not every disorder is relevant to a witness's credibility.

*Id.* at 289-90.

We determined that the second proffer, made via the Medical Administrator, was sufficient to show the information the defense intended to question the victim about on cross-examination and that that information raised "a serious question" about the victim's ability to accurately recollect the events at issue. *Id.* at 290.

At the point during the trial at which the judge's determinative ruling curtailed [the defendant's] right to cross-examine . . . the court had before it proffered evidence of a substantial psychiatric history, indicating a contemporary instability, which affected the victim's contact with reality as well as his ability "to recollect issues in any kind of detail." The reliability of the proffer was endorsed by its transmission through an officer of the court designated and directed by the court to enlighten it on the issue to be decided.

*Id.* at 288. The victim's mental health history was important to assessing his ability to perceive the critical events on which the charges were based. Accordingly, the trial court's ruling was an abuse of discretion that restricted a constitutional right, warranting reversal.

11

*Testerman v. State*, 61 Md. App. 257 (1985), in which the defendant was convicted of second-degree rape and related offenses, illustrates the limitations of the holding in *Reese*. The victim and the defendant had been acquaintances for fifteen years. One night, they happened to run into each other at a bar. According to the victim, they drank and socialized and then decided to go to another bar. She got in the defendant's car for that purpose. After driving for a while, he pulled his vehicle over to the side of the road, forced her to perform oral sex, and raped her. According to the defendant, the two spent some time at the first bar and then decided to go to a motel, where they engaged in consensual sex.

At trial, the defense maintained that the victim was suffering from a mental disorder and sought to cross-examine her about it. Defense counsel made a general proffer that the victim had been hospitalized for schizophrenia six years before the events in question, with no explanation of the nature of that diagnosis. The proffer did not indicate that the victim had been treated for this condition at any time thereafter. The court ruled that the evidence could not be used on cross-examination of the victim.

On appeal, the defendant argued that the ruling was erroneous. We disagreed and affirmed the convictions. Acknowledging that evidence of a witness's psychiatric history can be admissible if it is relevant, we distinguished the case from *Reese*, explaining that there was no evidence proffered to show the nature of the disorder and how it would affect the victim's credibility, and it had been six years since the victim had been treated for the condition.

Somewhat more recently, in *Clark v. State*, 364 Md. 611 (2001), the Supreme Court of Maryland considered a related issue: whether a criminal defendant had a right to cross-examine the State's primary witness about memory problems he had experienced. In 1982, two men were murdered in the course of a robbery of a bar in Baltimore County. The police developed suspects but did not make an arrest. In 1998, while re-investigating the case, the police interviewed one suspect, Michael Grimes, who admitted his involvement, implicated the defendant, and agreed to enter into a plea deal in which he would testify for the State. As it turned out, in 1991, Grimes had experienced an industrial accident for which he had filed a workers' compensation claim, in the course of which he reported memory problems, was seen by a psychiatrist for that reason, and was awarded benefits for a psychological injury. At trial, before Grimes testified, the defense sought leave to cross-examine him about the memory problems he had reported experiencing as a result of the 1991 accident. The trial court ruled that the defense could not explore that topic.

Eventually, the case reached the Supreme Court of Maryland, which reversed on that issue. Citing Rule 5-616(a)(5), the Court pointed out that a witness's ability to recollect the events central to the case being tried is a proper topic for cross-examination. Grimes was the State's star witness and, soon after the crime, had denied any involvement. Sixteen years later, he claimed to recall the events of the crime and the defendant's involvement in them. The Court held that Grimes's self-reported memory problems were relevant to whether, in 1999 at the time of trial, he accurately could recollect events that happened in 1982. And, to the extent it could be said that Grimes might be humiliated or embarrassed by inquiry into whether he had seen a psychiatrist in connection with his workers'

13

compensation case, he could be cross-examined about his memory problems without any reference to the case or the psychiatric examination.

***

Some federal courts and courts in jurisdictions outside Maryland have explored the boundaries of relevancy of mental health diagnoses for cross-examination of witnesses and, in particular, whether a diagnosis of bipolar disorder can be relevant. In doing so, they have focused on whether the mental health condition at issue would affect the witness's ability to accurately perceive, understand, and communicate the events central to his or her testimony at the time they happened, and therefore relate to the witness's credibility. In addition, the courts have assessed whether the mental health condition would affect the witness's ability to remember and convey the events when testifying at trial. By and large, the courts have allowed cross-examination about mental health diagnoses such as schizophrenia and conditions such as psychosis that affect a witness's ability to perceive reality, but not about others.

One Fourth Circuit case is pertinent. In *United States v. Society of Independent Gasoline Marketers of America*, 624 F.2d 461 (4th Cir. 1979) ("the *Gasoline Marketers Case*"), several independent gasoline station companies were convicted of conspiracy to fix prices and other antitrust crimes. On appeal, the Fourth Circuit reversed the convictions of Ashland Oil, Inc. ("Ashland"), on the ground that the trial court abused its discretion by disallowing access to psychiatric records of one of the government's star witnesses for aid in cross-examination. The witness, a former vice president of an Ashland subsidiary, had been hospitalized twice for psychiatric problems. Ashland subpoenaed the hospital records

14

for delivery directly to the trial court, and the trial judge reviewed them *in camera*. The court denied Ashland access to the records, ruling that their content could not be used for cross-examination of the witness because it was not clear that the hospitalizations were contemporaneous with the price fixing scheme.

During oral argument by Ashland on appeal, the panel judges questioned this ruling. They gave Ashland and the government access to the records and permitted additional briefing on the question whether, without the information in the records, Ashland's ability to effectively cross-examine the witness had been impaired. The psychiatric records revealed that, during the time of the alleged conspiracy, the witness had been hospitalized "'in [a] psychotic state[,]'" had been assessed as "'delusional and hallucinatory with poor judgment and insight,'" and had to be "'secluded for his own welfare.'" *Id.* at 467-68. His diagnosis was schizophrenic reaction, schizo-affective type. The appeals court held that the psychiatric records were relevant to the witness's ability to testify about his recollection of events and that reasonable jurors could have concluded that the witness's "ability to make rational observations was highly questionable." *Id.* at 468.

> [T]he ability of defense counsel to impeach [the witness] regarding his ability to properly perceive events about which he testified was severely limited by counsel's inability to examine the hospital records. **We can think of no more relevant or significant material than a hospital record indicating that a witness who is testifying against his former employer had been under treatment for mental illness which rendered him at that time delusional and hallucinatory with poor judgment and insight**. Although a trial court should seek to prevent the disclosure of embarrassing, irrelevant information concerning a witness, it is an abuse of discretion to preclude defense counsel from obtaining relevant information, and the witness'[s] privacy must yield to the paramount right of the defense to cross-examine effectively[.]

15

*Id.* at 469 (emphasis added). *See also United States v. Lindstrom*, 698 F.2d 1154, 1161-62 (11th Cir. 1983) (holding that the trial court abused its discretion by not allowing defense counsel to cross-examine government's primary witness about her mental health history when, at a time central to her testimony, she had been involuntarily committed to a hospital with "'schizophrenic reaction, chronic undifferentiated type,'" was "'suicidal[,] homicidal and delusional[,]'" and had a "'history of hallucinations'").

*United States v. Butt*, 955 F. 2d 77 (1st Cir. 1992), frequently cited on the issue of the right to cross-examine a witness about his or her mental health history, is consistent with the cases discussed above but under the particular circumstances reached a different outcome. There, two police officers were charged with conspiracy to extort money from prostitutes. Over a period of years, the officers had threatened to bring charges against a number of prostitutes if they did not make weekly payments to them. The government's primary witness was a prostitute who, for four years, met with the officers weekly and each time paid them $300 to protect her and the women who worked for her against arrest. The officers' defense was that none of this had happened and the primary witness and others supporting her testimony were lying.

Before trial, the defense learned that, at a time when the alleged scheme was being carried out, the primary witness had been hospitalized with depression after a suicide attempt. A magistrate judge ordered the government to hand over psychiatric records of the primary witness "to the extent that . . . the records tend to call into question the ability of the witness to perceive events accurately and/or to recount those events truthfully and accurately at a later time." *Id.* at 80 (cleaned up). After obtaining the records, the

16

government took the position that they did not meet that criteria. Nevertheless, the records were turned over to the court, which examined them *in camera* and ruled that almost all the records did not have to be provided.

On appeal, the First Circuit agreed that the information in the hospital records was not relevant to the primary witness's credibility.

> For over forty years, federal courts have permitted the impeachment of government witnesses based on their mental condition at the time of the events testified to. *See United States v. Hiss*, 88 F. Supp. 559, 559-60 (S.D.N.Y. 1950).[9] Evidence about a prior condition of mental instability that "provide[s] some significant help to the jury in its efforts to evaluate the witness's ability to perceive or to recall events or to testify accurately" is relevant. *United States v. Moore*, 923 F.2d 910, 913 (1st Cir. 1991). "The readily apparent principle is that the jury should, within reason, be informed of all matters affecting a witness's credibility…." *United States v. Partin*, 493 F.2d 750, 762 (5th Cir. 1974).

*Id.* at 82.[10] The court went on to say that, notwithstanding that precedent, "we are aware of no court to have found relevant an informally diagnosed depression or personality defect."

---

[9] *United States v. Hiss* as cited is a one-page memorandum opinion in the famous perjury case against Alger Hiss that stemmed from allegations by Whittaker Chambers that Hiss was a spy for the Soviet Union. Because espionage charges were time-barred, Hiss was charged with perjury based on allegations that his representations that he had not acted as a spy were false. Defense counsel sought to introduce the testimony of a psychiatrist to impeach Chambers's credibility. Acknowledging that there were no federal cases on the question, and that the only state cases were of no use because they were decided before psychiatry had developed as a medical specialty, the court stated: "The existence of insanity or mental derangement is admissible for the purpose of discrediting a witness." 88 F. Supp. at 559.

[10] In *Partin*, the Fifth Circuit held that the trial court abused its discretion by not allowing the defense access to hospital records of the government's primary witness that showed that, at a time central to the events in the case, he was admitted to a hospital with reports of "having auditory hallucinations" and at times thinking that "he was some other person." 493 F.2d at 763.

*Id.* The court distilled the holdings of cases in which a witness's mental history had been found to be a proper subject of cross-examination as follows:

> [The] federal courts appear to have found mental instability relevant to credibility only where, during the time frame of the events testified to, the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, such as schizophrenia, that dramatically impaired her ability to perceive and tell the truth.

*Id.* at 82-83.

In *United States v. Jimenez*, 256 F.3d 330 (5th Cir. 2001), the court synthesized the federal cases decided until then on the appropriate use of mental health conditions in cross-examination. Two defendants, acting with other members of their gang, participated in a retaliatory fire-bombing of the house of a rival gang member, causing the death of an occupant of the house. A juvenile who was not a gang member but was present during the fire-bombing became one of the government's chief witnesses. Shortly before trial, the government revealed that that witness had a mental health history and moved *in limine* to preclude the defense from cross-examining him about it. The trial judge reviewed the related hospital records *in camera*. They showed that, as a child, the witness developed hyperactivity and conduct disorders and, at one time during an argument with his mother, broke a mirror and threatened to kill himself. He was hospitalized for two weeks, diagnosed with depression, and treated with medication. Later, while still a juvenile, he attempted suicide twice while off his medication, and was admitted to the hospital again, with his depression being brought under control by medication. He experienced recurrences of depression while in custody and several years later. The trial court granted the government's motion *in limine*.

18

The defendants were found guilty of arson causing death and related crimes. On appeal, they argued, among other things, that the trial court had violated their confrontation rights by precluding cross-examination of the witness about his mental health history. Rejecting that argument, the Fifth Circuit explained:

> No rule outlines with precision the severity and timing that make a witness's mental illness relevant for impeachment purposes. But the decisions of this and other circuits stand for the general principle that a diagnosis of schizophrenia or a psychosis will be relevant, unless the diagnosis is too remote in time from the events alleged in the indictment.
>
> For witnesses whose mental history is less severe, district courts are permitted greater latitude in excluding records and limiting cross-examination.

*Id.* at 343-44 (citations omitted).[11] The court reviewed the witness's hospital record, which had been made part of the record on appeal, and determined that "there is only a tenuous argument that [the witness] suffered from an impairment affecting his ability to comprehend and tell the truth[,]" and he "was never diagnosed with a psychosis." *Id.* at 344. The court upheld the trial court's ruling as not being an abuse of discretion.

In 2006, the Supreme Court of New Hampshire issued two opinions addressing whether a defendant's confrontation rights under the federal and New Hampshire

---

[11] The court compared *Greene v. Wainwright*, 634 F.2d 272, 276 (5th Cir. 1981) (granting habeas corpus relief to convict who had been precluded from questioning primary witness against him about his bizarre behavior, indicative of mental stability at time of crime), *Lindstrom*, *Partin*, and the *Gasoline Marketers Case*, with *United States v. Diecidue*, 603 F.2d 535, 551 (5th Cir. 1979) (holding trial court did not abuse discretion by precluding cross-examination of primary government witness about his mental health history when evidence showed that his commitment to a hospital for mental health problems happened twelve years before the crime for which the defendant was on trial, and he had not been treated for a mental illness since then).

constitutions had been violated because he was not permitted to cross-examine the victim about his or her diagnosis of bipolar disorder. In both cases, convictions were reversed on another ground but the evidentiary issue was decided because it likely would recur on remand.

In *State v. Fichera*, 153 N.H. 588 (2006), the defendant and the victim separated after being in a relationship for many years and married for one year. Using the pretext that their neighbors would be meeting them to discuss an easement, the defendant tricked the victim into accompanying him to a vacant property near their house. He demanded sex, threatened the victim with a shotgun, and ultimately shot her. She managed to escape and get help. The defendant was charged with attempted murder, first-degree assault, kidnapping, and related crimes. At trial, the victim was the State's primary witness. Over a relevancy objection, the defense sought to cross-examine her about her diagnosis of bipolar disorder, arguing that it went to her credibility. The court sustained the objection, and when defense counsel asked it to reconsider, based on the fact that the witness was taking medication for that condition, the court denied the motion.

On appeal, the New Hampshire Supreme Court relied on two cases discussed above, *Jimenez*, 256 F.3d 330, and *Butt*, 955 F.2d 77, in upholding the trial court's ruling. The court explained that there must be an evidentiary foundation for cross-examination based on a mental illness, *Fichera*, 153 N. H. at 599, and "[t]o be relevant, the cross-examination must evidence an 'impairment' of the witness's 'ability to comprehend, know, and correctly relate the truth.'" *Id.* at 600 (quoting *Jimenez*, 256 F.3d at 343). The court determined that the defendant's offer of proof, which consisted of an alleged diagnosis of

bipolar disorder and a prescription for lithium "made 'at one point in the past,'" was insufficient. *Id.* Moreover, "[n]othing in the record suggested that [the victim] suffered from a severe mental illness, such as schizophrenia or another psychosis." *Id.* The court concluded that the defendant did not demonstrate that the witness's alleged bipolar disorder was relevant for impeachment purposes.

In *State v. McGill*, 153 N.H. 813 (2006), the defendant was indicted for first-degree assault after he struck his adult nephew with a machete after a night of drinking. At trial, on cross-examination of the victim, defense counsel established that he had not taken any medication on the day of the attack and had stopped taking his prescribed medication many weeks earlier. When defense counsel asked why, the State objected based on relevancy. Defense counsel asserted that the victim had been diagnosed with bipolar disorder, for which he had been prescribed medication, and that was a relevant topic of inquiry to determine the victim's state of mind and ability to perceive events when off his medication. The trial court sustained the State's objection.

Upholding that ruling on appeal, the Supreme Court of New Hampshire explained: "[M]ental instability is only relevant to credibility when, during the time of the events in question, the witness exhibited a disposition to lie or hallucinate, or suffered from a severe mental illness that dramatically impaired his ability to perceive and tell the truth." *Id.* at 817. The court observed that, "[a]fter the State objected, the defendant failed to make an

offer of proof that the witness's disorder caused him to lie or hallucinate or that the disorder otherwise affected his perception of the events in question." *Id.* at 818.

Since the decisions in *Fichera* and *McGill*, other courts have been asked whether a diagnosis of bipolar disorder was relevant to a witness's credibility. In *United States v. George*, 532 F.3d 933 (D.C. Cir. 2008), the defendant was charged with bank robbery. The government's primary witness was his sister, to whom he had confessed and who possessed additional incriminating information. In upholding the trial court's ruling that the defendant could not cross-examine the witness about her bipolar disorder, the court stated that "[n]othing in [the defendant's] proffer at trial indicated why bipolar disorder would cause [the witness] difficulty in perceiving reality or motivate her to hurt [the defendant]." *Id.* at 937. The court explained:

> The days are long past when any mental illness was presumed to undermine a witness's competence to testify. The category of mental illnesses includes a wide variety of conditions, of varying degrees of severity and substantially different effects. Simply labeling a witness as having "mental health problems," or alluding to her "issues with rage, anger, and racing thoughts," does not provide a basis for thinking she cannot correctly perceive reality. Mental illness is most highly relevant when "the witness exhibited a pronounced disposition to lie or hallucinate, or suffered from a severe illness, that dramatically impaired her ability to perceive and tell the truth." *United States v. Butt*, 955 F.2d 77, 82-83 (1st Cir. 1992).

*Id.* at 937 (cleaned up). *See also LaPointe v. State*, 196 S.W.3d 831, 837 (Tex. Ct. App. 2006) (holding that trial court in kidnapping and sexual assault case did not abuse its discretion by excluding evidence of victim's bipolar disorder, as the defense did not show that the disorder "would have affected [the victim's] ability to recall the events of the crime or to give truthful testimony at trial").

22

In cases decided more recently, courts likewise have concluded that a showing of bipolar disorder was not relevant to a witness's credibility. *See United States v. Fattah*, 914 F.3d 112, 181 (3d Cir. 2019) ("The restriction on asking the witness about his bipolar disorder was not a significant limitation of [the defendant's] right to inquire into the witness's memory or perception."); *People v. Johnson*, 473 Ill. Dec. 835, 842 (2023) (observing generally that questions about whether the victim was diagnosed with bipolar disorder "did not necessarily relate to the victim's ability to perceive or her credibility"); *People v. Thomas*, 107 A.D.3d 1532, 1532-33 (N.Y. App. Div.) (upholding trial court's decision to limit cross-examination about the witness's bipolar disorder), *leave to appeal denied*, 22 N.Y.3d 998 (N.Y. 2013).

***

We return to the case at bar. Whether the trial court erred or abused its discretion in ruling that the appellant's bipolar disorder was not a proper topic of cross-examination involves two sub-questions. First, did the defense adequately proffer evidence relevant to M.B.'s credibility? And second, if so, did the trial court abuse its discretion in deciding that the potential for unfair prejudice in the use of that evidence for cross-examination substantially outweighed its probative value for assessing M.B.'s credibility?

In most of the cases we have discussed, one party filed a pretrial motion seeking to use, or to prevent the other party from using, information about an important government witness's mental health on cross-examination. No such motion was filed here, although it was clear that the stabbing was witnessed only by M.B. and the assailant, making M.B. the State's star witness whose credibility would be an essential issue for the jury. The issue

23

was not raised until M.B. was asked, on cross-examination, whether he had a mental illness when he participated at Vesta. The court sustained an objection, but M.B. answered "yes" after the ruling, and there was no motion to strike. Despite that ruling, defense counsel asked M.B. whether he was "hearing voices in [his] head" on the day of the stabbing, to which he answered no, or prior to that, to which he also answered no. After those answers were given, a late objection was made and sustained, again without a motion to strike. Thus, cross-examination of M.B. elicited that at some undefined period of time he had an unspecified mental illness and neither on the day of the stabbing nor before then had he been hearing voices.

Upon a further objection to this line of questioning, the court held the bench conference we have recounted above at which defense counsel made a bare-bones proffer that M.B. had been diagnosed with bipolar disorder and was prescribed medication for it. He gave no factual basis for the proffer. He made no reference to the UM hospital record, which was in evidence. Nor did he seek permission to question M.B. outside the presence of the jury to determine whether he had, in fact, been diagnosed with bipolar disorder and, if so, when and if he was being treated for it.

In their briefs, the parties make minimal reference to the UM hospital record for M.B. The appellant points out a nursing entry documenting M.B.'s mentioning "happy pills," which is vague and reveals nothing about whether he had a mental illness. The appellant also references a social worker entry asking whether "client [is] currently

24

receiving mental health counseling" or has received counseling in the past, answering "yes" to both. Again, that note conveys little.[12]

However, a closer review of the hospital record discloses an entry from the date of admission setting forth M.B.'s "Past Medical History" that includes "Bipolar disorder (CMS/HCC)."[13] The hospital record also lists M.B.'s medications upon admission and upon discharge, including Tegretol, a brand name for carbamazepine, a medication that can be used to treat bipolar disorder. *See Carbamazepine*, Mayo Clinic, https://perma.cc/8FB4-92YJ. Both entries are accompanied by the comment, "[p]atient not taking." Although defense counsel's proffer as made was sparse and seemed to offer no foundation for the representation that M.B. had been diagnosed with bipolar disorder, the hospital record in fact provided a foundation for that assertion. Between M.B.'s acknowledgement that he had a mental disorder, without specification, and the content of the hospital record, the proffer that M.B. had been diagnosed with bipolar disorder was based in fact.

That is not sufficient for an adequate proffer, however. To be adequate, the proffer must demonstrate not only that the witness has a mental disorder but also that his having the disorder is relevant to what the proponent of the evidence intends to use it for, which

---

[12] The appellant also refers to the prosecutor's remark, after M.B. failed to appear for a trial date that became a pretrial hearing, that he suffers from mental health issues. *See* footnote 4, *infra*. That remark did not establish anything about M.B.'s mental health.

[13] "CMS" stands for Centers for Medicare and Medicaid Services, the federal agency that administers those health care programs. *Hierarchal Condition Categories (HCCs)*, Definitive Healthcare, https://perma.cc/3KR8-MCW7. Within the context of CMS, the initials "HCC" stand for "Hierarchical Condition Categories." HCCs "are medical codes that correspond to certain clinical diagnoses" and are used by CMS "to identify patients with chronic or severe acute conditions for the risk adjustment model." *Id.*

25

in this case and the others we have discussed was to impeach the witness's credibility. As we explained years ago in *Reese*, and later was incorporated into Rule 5-616, this type of impeachment is concerned with whether the witness's disorder impairs or interferes with his ability to grasp the reality of experienced events, accurately recall them, and truthfully relate them to a fact-finder. If a witness, at a pertinent time period, suffers from a mental disorder producing a defect in the powers of perception, memory, or communication, that would be information essential for the fact-finder to know in assessing the witness's credibility.

The cases we have discussed recognize this, drawing a distinction between those mental conditions that generally are regarded as affecting perception, memory, or communication and those that are not. Most often, the courts have singled out schizophrenia and psychosis, a core feature of schizophrenia and one that can be a feature of other diseases, as mental conditions relevant to credibility.[14] Schizophrenia is "a mental

---

[14] The Cleveland Clinic gives the following everyday definition of psychosis:

> Psychosis is the term for a collection of symptoms that happen when a person has trouble telling the difference between what's real and what's not. This disconnection from reality can happen for several reasons, including many different mental and physical conditions. It's usually treatable with medication and other techniques.

*Psychosis*, Cleveland Clinic, https://perma.cc/49MG-37P4. The National Institute of Mental Health has explained:

> People with psychosis typically experience delusions (false beliefs, for example, that people on television are sending them special messages or that others are trying to hurt them) and hallucinations (seeing or hearing things that others do not, such as hearing voices telling them to do something or

(continued…)

26

health disorder that changes how you think, feel and act. It can cause delusions, hallucinations and disorganized thinking." *Schizophrenia*, Cleveland Clinic, https://perma.cc/RGD4-YZQ9. The most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders*, the American Psychiatric Association's professional reference on mental health and brain-related disorders, provides that a diagnosis of schizophrenia requires, among other things, two or more of the following over a period of one month or longer: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms such as diminished emotional expression. *See Diagnostic & Statistical Manual of Mental Disorders*, Am. Psychological Ass'n, at 101 (5th ed. 2022) ("DSM-5-TR"). With mental disorders of this type, a person's perception of an event does not comport with reality, undermining the credibility of the person's factual recitation about the event and ability to remember and correctly describe it.

By contrast, bipolar disorder (actually disorders, as there are three primary types) ordinarily affects a person's mood, not his or her ability to perceive reality. The American Psychiatric Association gives the following description:

> Bipolar disorders are mental health conditions characterized by periodic, intense emotional states affecting a person's mood, energy, and ability to function. These periods, lasting from days to weeks, are called mood episodes. Mood episodes are categorized as manic/hypomanic episodes where the predominant mood is intensely happy or irritable, or depressive episodes when there is an intensely sad mood or the ability to

---

criticizing them). Other symptoms can include incoherent or nonsense speech and behavior that is inappropriate for the situation.

*Understanding Psychosis*, Nat'l Inst. of Mental Health, https://perma.cc/NMQ8-9ZL5.

experience joy or pleasure disappears. People with bipolar disorder generally have periods of neutral mood as well. When treated, people with bipolar disorder can lead full and productive lives.

*Bipolar Disorders*, Am. Psychiatric Ass'n, https://perma.cc/J9HD-GJY9. The diagnostic criteria for the primary bipolar disorders are: bipolar I, at least one manic episode lasting a minimum of one week and episodes of depression or hypomania; bipolar II, at least one hypomanic episode of a minimum of four days in a row and at least one major depressive episode; and cyclothymic disorder, two years of mood swings between mania and depression. DSM-5-TR, at 139. That chapter of the DSM-5-TR lists the symptoms that constitute an episode of mania, and the symptoms that constitute an episode of major depression.[15] It is possible for a person with bipolar I disorder to experience psychotic features to the disease during a severe episode of mania. *Id.* at 140. Unlike schizophrenia and other psychosis-related mental illnesses, symptoms of psychosis, such as delusions and hallucinations, are not a core element of bipolar disorder, however. *Id.* at 139.

As noted, in the case at bar, the appellant was pursuing a defense of lack of criminal agency, i.e., that someone else stabbed M.B. He conceded, as he had to, that M.B. actually

---

[15] The symptoms (at least three of which must be present) for a manic episode are inflated self-esteem or grandiosity; decreased need for sleep; more talkative than usual, or pressure to keep talking; flight of ideas or subjectively racing thoughts; distractibility, reported or observed; increase in goal-directed activity or psychomotor agitation; excessive involvement in activities with the high potential for painful consequences, for example spending sprees, sexual indiscretions, and foolish business investments. The symptoms (at least five of which must be present) for a major depressive episode are at least two weeks of intense sadness or loss of interest in activities once enjoyed and at least four of the following: feelings of worthlessness or guilt; fatigue; increase or decrease in sleep; increase or decrease in appetite; restlessness or slowed speech or movement; difficulty concentrating; frequent thoughts of death or suicide.

was stabbed and did not imagine being stabbed. Given the locations of the stab wounds, the assailant was facing M.B. during the attack. Notwithstanding that the appellant and M.B. had known each other and worked at the same location for years, the appellant's theory of defense was that M.B. must have hallucinated or been under a delusion that he (the appellant) was the stabber. Therefore, defense counsel needed to proffer evidence capable of impeaching M.B.'s credibility by showing that M.B. had a mental health condition that could have caused him to hallucinate or suffer the delusion that the person who stabbed him was the appellant, when it was not. In other words, the proffer had to demonstrate that there was evidence that M.B. was so untethered to reality that he imagined the appellant was the person stabbing him.

Defense counsel's proffer to the court lacked anything to connect M.B.'s bipolar disorder to an impairment of his ability to perceive reality at any time, let alone during the stabbing, or to accurately recall the central facts of the stabbing. Given the essential nature of bipolar disorder as a mood disorder, simply declaring that M.B. had been diagnosed with that disease could not suffice to show that he had hallucinated that the appellant had stabbed him or was deluded into thinking that. For a proffer to adequately show that M.B.'s bipolar disorder could have caused him to break from reality and hallucinate or operate under the delusion that the appellant was stabbing him when he was being stabbed by someone else, at the very least, it would have had to have been based on a history of M.B.'s experiencing psychotic features to his bipolar disorder. In the cases we have discussed that allowed cross-examination about mental disorders, the disorders were characterized by breaks from reality, and the party seeking to cross-examine the witness about the disorder had evidence

29

that the witness had suffered episodes, within the relevant time frame, in which he or she had lost touch with reality. In those cases, most often the proffers given were based on the witness's psychiatric records. Here, no effort was made to obtain any such records of M.B. There was nothing in evidence or proffered to be added to the evidence to support M.B.'s ever having suffered a psychotic episode as part of his bipolar disorder. Indeed, when M.B. was asked whether he had heard voices in his head (a question that lacked foundation), he answered that he had not.[16] The appellant's proffer to support cross-examining M.B. about his diagnosis of bipolar disorder was legally insufficient to show that the disorder was relevant to his credibility. That reason alone warrants our upholding the trial court's ruling.

Even if the proffer that M.B. had bipolar disorder had been adequate, which it was not, we would conclude that the trial court properly exercised its discretion to prohibit cross-examination on that topic because any probative value it might have had was substantially outweighed by the danger of unfair prejudice. Md. Rule 5-403 (stating relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, [or] waste of time"). In the absence of any evidence that M.B. had ever suffered from hallucinations or delusions, cross-examination about bipolar disorder so as to imply that that disease could or would have interfered with his ability to perceive who was stabbing him would unfairly prejudice his testimony in the eyes of the jurors. The court's decision certainly was not "well removed from any center mark

---

[16] If there had been any foundation for that question at all, the questioning should not have taken place in front of the jury in any event.

imagined by the reviewing court and beyond the fringe of what that court deems minimally acceptable[.]" *State v. Robertson*, 463 Md. 342, 364-65 (2019) (cleaned up).

We conclude that the trial court did not err or abuse its discretion by prohibiting cross-examination of M.B. about his bipolar disorder.

**II**.

The appellant next contends the evidence was legally insufficient to prove the elements of attempted first-degree murder or attempted second-degree murder. Specifically, he argues that the State failed to prove specific intent to kill M.B., a necessary element of both crimes, and deliberation and premeditation, necessary elements of attempted first-degree murder. The State counters that, on the evidence adduced, reasonable jurors could find all the elements of both crimes.

In deciding a challenge to the sufficiency of the evidence, we "'examine the record solely to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Beckwitt v. State*, 477 Md. 398, 429 (2022) (quoting *State v. Wilson*, 471 Md. 136, 159 (2020)). *Accord Jackson v. Virginia*, 443 U.S. 307, 319 (1979). We view the evidence, both direct and circumstantial, and all rational inferences that may be drawn from the evidence in a light favorable to the State, as the prevailing party. *Beckwitt*, 477 Md. at 429. We do not determine whether *we* believe the evidence adduced at trial because "weighing the credibility of witnesses and resolving conflicts in the evidence are matters entrusted to the sound discretion of the trier of fact." *Scriber v. State*, 236 Md. App. 332, 344 (2018) (quotation marks and citation omitted).

31

"Our deference to reasonable inferences drawn by the fact-finder means we resolve conflicting possible inferences in the State's favor, because we do not second-guess the jury's determination where there are competing rational inferences available." *State v. Krikstan*, 483 Md. 43, 64 (2023) (cleaned up). Thus, the question we must answer "is not whether the evidence *should have or probably would have* persuaded the majority of fact finders but only whether it *possibly could have* persuaded *any* rational fact finder." *Scriber*, 236 Md. App. at 344 (emphasis in original; quotation marks and citation omitted).

"Murder is a single common law crime in Maryland that has been defined as 'the killing of one human being by another with the requisite malevolent state of mind and without justification, excuse, or mitigation.'" *Kouadio v. State*, 235 Md. App. 621, 627 (2018) (quoting *Ross v. State*, 308 Md. 337, 340 (1987)); *Harrison v. State*, 382 Md. 477, 488 (2004)). "By statute, the crime has been divided into two degrees for purposes of punishment." *Kouadio*, 235 Md. App. at 627 (citing *Burch v. State*, 346 Md. 253, 274 (1997)). "All murder – first and second-degree – requires proof of malice." *Id.* (citing *Gladden v. State*, 273 Md. 383, 388 (1974)). Malice is "'the intentional doing of a wrongful act to another without legal excuse or justification'" and includes "'any wrongful act done willfully or purposely.'" *Id.* (quoting *Gladden*, 273 Md. at 388, in turn quoting *Chisley v. State*, 202 Md. 87, 105 (1953)). Murders in the first degree include "murders committed in the perpetration of enumerated felonies or any kind of willful, deliberate and premeditated killing." *Harrison*, 382 Md. at 488. "Second-degree murder includes all other types of murder." *Id.*

"To be guilty of the crime of attempt, one must possess 'a specific intent to commit a particular offense' and carry out 'some overt act in furtherance of the intent that goes beyond mere preparation.'" *Id.* (quoting *State v. Earp*, 319 Md. 156, 162 (1990)).

> On a charge of attempted murder it is not sufficient to show that the defendant intended to do serious bodily harm or that he acted in reckless disregard for human life. Attempted murder requires an intent to bring about the result described by the crime of murder (i.e., the death of another).

*Id.* at 488-89 (cleaned up). Thus, "[o]ne has committed second-degree attempted murder when he or she harbors a specific intent to kill the victim and has taken a substantial step toward killing the victim." *Id.* at 489.

As set forth succinctly in the Maryland Criminal Pattern Jury Instructions, to convict a defendant of attempted First-Degree Premeditated Murder, the State must prove,

> 1) that the defendant took a substantial step, beyond mere preparation, toward the commission of murder in the first degree;
> 2) that the defendant had the apparent ability, at that time, to commit the crime of murder in the first degree; and
> 3) that the defendant willfully, and with premeditation and deliberation, intended to kill [the victim].

MPJI-Cr 4:17.13A. It is undisputed that the appellant took a substantial step toward the commission of first-degree murder and that he had the apparent ability to commit that crime. The appellant's sufficiency argument focuses on proof, or lack of proof, that he "willfully, and with premeditation and deliberation, intended to kill the victim."

First, the appellant maintains that, on the evidence introduced, reasonable jurors would have to resort to speculation to find that he acted with the specific intent to kill M.B. He points out that the stabbing encounter was brief and happened quickly; he did not chase after M.B. to "finish him off"; there was nothing said that evidenced an intent to kill;

33

although the injuries were to M.B.'s chest and required hospitalization, "there was no battering or bludgeoning of the head or face"; and there was no evidence that he bore any hostility toward M.B.

The intent to kill, being subjective, may be shown by facts that permit an inference of its existence. *Earp*, 319 Md. at 167. It is well established that, under the proper circumstances, an inference of the intent to kill may be drawn "from the use of a deadly weapon directed at a vital part of the human body." *Id. See also State v. Raines*, 326 Md. 582, 591 (1992) (holding that an intent to kill could be drawn from evidence that defendant shot a gun at the driver's side window of a truck, knowing that the driver's head was on the other side of the window). As our Supreme Court explained decades ago,

> The deliberate selection and use of a deadly weapon directed at a vital part of the body is a circumstance which indicates a design to kill, since in the absence of evidence to the contrary, the law presumes that one intends the natural and probable consequences of his act.

*Davis v. State*, 204 Md. 44, 51 (1954).

The evidence in the case at bar was that the appellant used a knife with a seven inch blade to stab M.B. in the chest, where the lungs and heart, both vital organs, are located. He did so twice, and tried to do so a third time. The evidence that the appellant used a knife of the size described by M.B. directed at M.B.'s chest was in and of itself legally sufficient evidence to support a reasonable inference by a rational fact-finder that the appellant intended to kill M.B.

The appellant's arguments downplay this essential evidence and focus on stray items of evidence that, contrary to what the standard of review requires, are the least

34

favorable, not the most favorable, to the State as the prevailing party. In the light most favorable to the State, the stabbings ended not because the appellant decided to discontinue his attack but because M.B. managed to gain control over the appellant and escape. And the most reasonable inference that can be drawn from the fact that the appellant did not run after M.B. to "finish him off" was that he did not want to be caught. The absence of beating around the head or face is irrelevant to whether the appellant intended to kill M.B. by stabbing him in the chest. Certainly, it was not necessary for the appellant to verbally express his intention to kill M.B. The stabbing itself evidenced that the appellant harbored hostility toward M.B., perhaps because M.B. was married to the woman with whom the appellant was involved.

Second, the appellant asserts that the evidence was legally insufficient to prove that he acted with deliberation and premeditation. "For murder 'to be "deliberate" there must be a full and conscious knowledge of the purpose to kill; and to be "premeditated" the design to kill must have preceded the killing by an appreciable length of time[.]'" *Mitchell v. State*, 363 Md. 130, 148 (2001) (quoting *Tichnell v. State*, 287 Md. 695, 717 (1980)). An "[a]ppreciable length of time simply means any amount of time sufficient to convince the trier of fact that the purpose to kill was not the immediate offspring of rashness and impetuous temper, but was the product of a mind fully conscious of its own design." *Id.* (quotation marks and citation omitted). "If the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder." *Tichnell*, 287 Md. at 718. *See also Lipinski v. State*, 333 Md. 582, 589 (1994) (stating that there is

premeditation if "the defendant had sufficient time to consider the decision whether or not to kill and weigh the reasons for or against such a choice" (quotation marks and citation omitted)). Multiple injuries may be considered as proof of premeditation. *See Booth v. State*, 306 Md. 172, 190-91 (1986) (recognizing that a fact-finder "may consider the multiple injuries and their intensity suffered by the victim as providing adequate evidence of premeditation" (quotation marks omitted)), *vacated in part on other grounds*, 482 U.S. 496 (1987); *Anderson v. State*, 227 Md. App. 329, 348 (2016) ("In sum, the evidence, which included multiple shots fired at and striking [the victim] from close range (with at least one at a vital part of the anatomy), was legally sufficient to support a conviction for attempted first-degree murder.").

The appellant argues that evidence that the attack was brief, that the assailant "let M.B. go *to live*" (emphasis in the appellant's brief), that M.B. and the appellant were friendly before the incident, and there was nothing to show a motive on the appellant's part to kill M.B. all militate against a finding of deliberation and premeditation. He adds that the manner in which the stabbing was carried out is consistent with an assailant acting in "an impulsive and senseless frenzy" and that there was no evidence that the assailant acted with anything more than an intent to injure, which would negate any finding of deliberation.

Once again, this argument rests upon an interpretation of the evidence that is least favorable to the State and a failure to consider evidence that favors the State. Reasonable jurors could find from the evidence that the appellant knew that Vesta was M.B.'s place of work and on the day in question drove to the parking lot for the Vesta building using a car

with which he would not be identified. He managed to enter the building, and went to M.B.'s office. He was armed with a long knife that constituted a deadly weapon. When M.B. turned him away once, he returned and entered M.B.'s office, closing the door behind him. This evidence could support a reasonable inference that the appellant had planned to kill the appellant by stabbing him and set about doing so in a way that he would not be seen by anyone other than M.B. The evidence also showed that, during the relevant time frame, the appellant was involved in an intimate relationship with M.B.'s wife, which itself could serve as a motivation to eliminate M.B. from her life. And as already explained, the appellant perpetrated the attack by stabbing M.B. in his chest, twice, and trying to stab him again. The evidence viewed most favorably to the State could support a rational finding that the appellant would have continued stabbing M.B. but for M.B.'s managing to get away – not that the appellant decided to let the appellant go so he could live. Indeed, that is the opposite of what the evidence most favorable to the State showed.

Upon application of the proper standard of review, we conclude that the evidence presented to the jury supported reasonable findings that the appellant intended to kill M.B. and that he acted deliberately and with premeditation in attempting to fulfill his intent to kill. Accordingly, the evidence was legally sufficient to support the appellant's conviction of attempted first-degree murder. As the elements of attempted second-degree murder are a subset of those of attempted first-degree murder, the evidence was legally sufficient to support the conviction of the latter as well.

## III.

Before jury selection started, the trial judge asked counsel whether the parties had tried to resolve the matter. The prosecutor responded that the State had offered a plea agreement to attempted second-degree murder, with a maximum sentence of thirty years. As part of the deal, the State would seek a ten year sentence, and the appellant would be free to allocute based on the sentencing guidelines. Defense counsel informed the court that the guidelines for that crime called for a sentence of between seven and thirteen years, that the offer had been communicated to the appellant, and that he had rejected it and wished to proceed to trial. Addressing the appellant directly, the judge confirmed that he understood that the maximum penalty he was facing was life in prison for attempted first-degree murder. The judge noted that the plea offer had been withdrawn and called for a venire panel.

At sentencing, the court heard from M.B., who said he continued to experience pain from the injuries the appellant had inflicted and his sense of safety for himself and his daughter had been undermined. He stated that the appellant had "robbed us of our peace and security[,]" and the trauma he had endured had left him in a "state of heightened anxiety." He asked the court to impose the maximum sentence.

The prosecutor called the court's attention to the appellant's numerous prior convictions, including for burglaries and armed robbery, and also asked the court to impose the maximum sentence. Noting that the guidelines called for fifteen to thirty years' incarceration, she asked, alternatively, that, if the court should decline to impose a life sentence, it sentence the appellant in accordance with the "top of the guidelines[,]" and

38

perhaps suspend all but forty, thirty, or twenty-five years. The prosecutor observed that M.B. still did not "understand why this happened" and that he was concerned about his daughter because her mother was "in a significant . . . relationship" with the man who had tried to kill her father.

Defense counsel reminded the court that the appellant had worked and resided at Vesta, which provides counseling and treatment for individuals with "psychological infirmities," and informed the court that the appellant had been diagnosed with schizophrenia and had served a prior period of incarceration "as a youth[.]" The following ensued:

> [DEFENSE COUNSEL]: . . . [The appellant's] period of time in jail as a younger man was quite traumatic and I'm certain exacerbated by his mental health diagnosis and his situation. I think largely his decision-making in this case was influenced by the prospect of going back to jail. We had conversations where I was somewhat confused by his thought process, as we discussed potential resolution to the case and proceeding forward. But I will tell you –
>
> THE COURT: The State made a rather generous offer –
>
> [DEFENSE COUNSEL]: In retrospect, it was generous, as he's been convicted of this offense.
>
> THE COURT: -- to avoid the victim having to be put through a trial.
>
> [DEFENSE COUNSEL]: Well, I understand that. And I can say this, because I make no concessions. Obviously, he is in a situation where his future will be determined by not only the Court's decision today but also subsequent review of his case and his situation. But the offer that was extended -- the offer that was on the table was a ten-year sentence or it was a cap of ten years. And I can tell you that I believe in my core, in my heart, that his decision-making as to entertaining any play [sic] that involved jail time at all was influenced by his experience within the jail.

39

The court heard from witnesses who supported the appellant, including T.C., who began her testimony by identifying herself as a "psychiatric rehabilitation practitioner." She said she is the appellant's "provider and supervisor" and characterized him as "a hard worker and a team player." She claimed to have witnessed him "display unselfish acts of humanity[,]" noting that he had helped save a coworker who suffered a "massive heart attack" at work. She concluded as follows:

> [The appellant] is a kind and thoughtful man who is always trying to encourage others to do the right things in life, so that they do not follow the path that he had chosen early on in life. It is my professional opinion that [the appellant] would benefit from intensive outpatient therapy to help address his introvertism (sic), isolation, and grief. I would assert that supervised, community-based monitoring would be appropriate to monitor his community activities. In my opinion, incarceration would be detrimental to the 17 years of progress and rehabilitation [the appellant] has made and will further decompensate mentally. I thank the Court for allowing me to speak on [the appellant's] behalf.

> At that point, the judge engaged T.C. in the following dialogue:

> THE COURT: I have a few questions. You're here as his character witness, but you're not 100 percent honest with the Court. The three of you work together -- yourself; [the appellant]; and the victim. And at the time, you were married to the victim, correct?

> [T.C.]: At the time –

> THE COURT: See, you're not 100 percent honest with it. You're giving this professional opinion.

> [T.C.]: No. I'm asking –

> THE COURT: You work with him professionally. But at the time, all three of you worked together. You were married to the victim, correct, when you and [the appellant] engaged in a relationship? Is that accurate or not?

> [T.C.]: No. That's not accurate. When this happened, we weren't. I was not working there.

40

THE COURT: Okay. But what my point is, if -- sometime the three of you all worked together, correct?

[T.C.]: At some point, yes, we did.

THE COURT: Yes. And at some point, you and [the appellant] engaged in a relationship while you were married to the victim, right?

[T.C.]: Right, but not while I was working there.

THE COURT: Okay. But my point is is that you weren't 100 percent honest. You're here as a character witness –

[T.C.]: Right.

THE COURT: -- for him, but you weren't 100 percent honest with the Court. Because your name is in the statement of charges, I'm familiar with it.

[T.C.]: Um-hum.

THE COURT: But I don't know if [defense counsel] suggested that you come or not suggest that you come, but you weren't 100 percent honest [with] the Court.

[T.C.]: I didn't bring my personal life into this because it was a character reference for him.

THE COURT: Well, in your letter, you said, "It is unfortunate and criminal that my former husband is taking out the demise of our marriage and family on [the appellant]." You brought in your personal life in your letter to me.

[T.C.]: Okay.

THE COURT: Thank you very much.[17]

_____

[17] In T.C.'s letter to the court, dated February 1, 2024, she wrote: "I was astounded to hear of the accusations of assault made against [the appellant] by the victim, my former husband [M.B.] It is unfortunate and criminal that my former husband is taking out the demise of our marriage and family on [the appellant]."

After other character witnesses spoke in his support, the appellant addressed the court:

> [THE APPELLANT]: Okay. Thank you. I wanted to say, as far as the victim impact statement, and I was -- excuse me, I was out on bond and had no contact with [sic] victim. And I complied with things like that. And just like my brother said, [M.B.] would -- he didn't say [M.B.], but [M.B.] would not have to worry about myself in his presence or anything like that. I'm somebody who -- I'm a protector, but -- all I want to say is I'm not a threat to society, [Your Honor]. I saw, in my opinion, your demeanor that you seem like you're angry towards myself and what happened -- that they say happened.
>
> THE COURT: I'm not angry. I'm not angry at all.
>
> [THE APPELLANT]: Okay. I apologize.
>
> THE COURT: No, sir.
>
> [THE APPELLANT]: But I'm not -- I'm more of an asset to society than a detriment. That's all I have to say, Your Honor.
>
> THE COURT: Thank you, sir.

The judge proceeded as follows:

> THE COURT: Very well. I remember the facts of the case very clearly from the court and that [the appellant] was identified as the individual that came in with a knife. They said his car was out there in the parking lot for a little while and that the victim came in and very clearly described what had happened and identified [the appellant]. This was more than just a workplace happening or event. The situation was more than just unfortunate for the victim. This is an individual who is sitting at his desk at work and all of a sudden is attacked by someone he knows and works with. It does leave not just physical scars but psychological scars.
>
> I am not insensitive to the fact that you've had some challenges with your mental health over the years. I'm very sensitive to that. As a judge in the district court, I presided over mental health court. As a judge here in the circuit court, I preside over the adult drug court. So I'm very sensitive to individuals and some of their struggles when it comes to mental health. But I do know that you were working with an organization, Vesta, that deals with

42

individuals who have mental health struggles. So not only had you received the help, but then you were employed there as well, helping others. So you had the tools, the arsenal, in your tool belt to deal with any situations other than dealing with them violently. And on that particular day, you just succumbed to -- I don't know if it was your thoughts or what it was and dealt with the situation violently, when I know you were taught over the years, because you had been there for some time, again, not only as a patient-participant but also as someone who worked there, very familiar that there are other ways to deal with situations. And unfortunately, you chose to deal with it in a violent way.

After stating that the maximum sentence for attempted first-degree murder is life in prison, and the guidelines for the appellant were fifteen to thirty years, the judge imposed a sentence of fifty years' incarceration, suspend all but twenty years, with five years' supervised probation. The remaining counts were merged, and the appellant was ordered not to contact M.B. or his daughter.

In his last question presented, the appellant contends the sentencing judge abused her discretion by punishing him for rejecting the State's plea offer and instead exercising his right to a jury trial; and by creating an appearance of impropriety by challenging the credibility of his character witness, T.C. The appellant concedes that these issues are not preserved for review but asks that we recognize plain error. He seeks to have his sentence vacated and the case remanded for a new sentencing hearing before a different judge.

The State responds that the extraordinary remedy of plain error review is not warranted here because the court's reference to the pretrial plea offer as "rather generous" was not improper, and the court did not "punish" the appellant for choosing to reject the plea offer and proceed with trial; and the court did not create an appearance of impropriety when it questioned T.C. about her representations to the court at sentencing.

43

Generally, "we review sentences only to determine whether the sentence is within statutory limitations, whether the sentencing judge was motivated by ill-will, prejudice, or other impermissible considerations, whether the sentence constitutes cruel and unusual punishment in violation of the Eighth Amendment, and whether the sentence violates any other constitutional provisions." *Lopez v. State*, 458 Md. 164, 179 (2018) (cleaned up). "A trial court may exercise wide discretion in fashioning a defendant's sentence." *Sharp v. State*, 446 Md. 669, 685 (2016) (quotation marks and citation omitted). "Indeed, only rarely should a reviewing court interfere in the sentencing decision at all, especially because the sentencing court is virtually always better informed of the particular circumstances." *Howard v. State*, 232 Md. App. 125, 175 (2017) (cleaned up). "Thus, generally, [a court on appeal] reviews for abuse of discretion a trial court's decision as to a defendant's sentence." *Sharp*, 446 Md. at 685.

A criminal defendant may be resentenced if an appellate court concludes the sentencing court "'might have been motivated by ill-will or prejudice' or other impermissible consideration in rendering its sentence." *Townes v. State*, 264 Md. App. 500, 510 (2025) (quoting *Jackson v. State*, 364 Md. 192, 207 (2001)). To make that determination, we examine "'the entirety of the judge's comments at sentencing and consider the challenged comments in that context.'" *Id.* (quoting *Ellis v. State*, 185 Md. App. 522, 552 (2009)).

"Under Maryland Rule 8-131(a), a defendant must object to preserve for appellate review an issue as to a trial court's impermissible considerations during a sentencing proceeding." *Sharp*, 446 Md. at 683. *See also Abdul-Maleek v. State*, 426 Md. 59, 69 (2012)

44

("[S]ubject to the appellate court's discretion under Maryland Rule 8-131(a), the defendant is not excused from having to raise a timely objection in the trial court." (quotation marks and citation omitted)). The appellant concedes that he did not object during the sentencing hearing and therefore the issues he raises are not preserved for review. As noted, he asks that we recognize plain error.

"'Appellate invocation of the plain error doctrine 1) always has been, 2) still is, and 3) will continue to be a rare, rare phenomenon.'" *Winston v. State*, 235 Md. App. 540, 567 (2018) (cleaned up) (quoting *Morris v. State*, 153 Md. App. 480, 507 (2003)). Review for plain error is reserved for error that is "compelling, extraordinary, exceptional or fundamental to assure the defendant a fair trial." *Savoy v. State*, 420 Md. 232, 243 (2011) (quotation marks and citation omitted). Plain error must be premised on a legal error that: (1) was not "intentionally relinquished or abandoned"; (2) is "clear or obvious"; and (3) concerns the appellant's "substantial rights" by affecting the outcome. *Winston*, 235 Md. App. at 567 (citing *Newton v. State*, 455 Md. 341, 364 (2017)). If these "three conditions are met, the appellate court may remedy the error if it affects the fairness, integrity, or reputation of judicial proceedings." *Vangorder v. State*, 266 Md. App. 1, 38 (2025) (cleaned up). "Meeting all four conditions is, and should be, difficult." *Winston*, 235 Md. App. at 568 (citing *Givens v. State*, 449 Md. 433, 469 (2016)). In the absence of all those conditions, an appellate court may not review an unpreserved error. *Id.*

The appellant maintains that we should recognize plain error based on the sentencing court's comment that, before trial, the State had made a "generous offer" to him. He interprets this comment as showing that the sentencing court was punishing him

for rejecting the plea offer and choosing to exercise his right to a jury trial. We find no merit in this argument.

'"It is absolutely clear that a trial court may not punish a defendant for invoking his right to plead not guilty and putting the State to its burden of proof for protesting his innocence."' *Holmes v. State*, 209 Md. App. 427, 457-58 (2013) (quoting *Jennings v. State*, 339 Md. 675, 684 (1995), in turn citing *Johnson v. State*, 274 Md. 536, 542-43 (1975)). *See also Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort[.]"). In *Johnson*, after the sentencing court commented that the defendant had not been truthful at trial and the defendant claimed he had been, the court stated:

> And when you sit up here and lie about it, and you're not telling the truth. You think you're trying to get away with it. That attitude is not consistent with any consideration for leniency. *If you had come in here after this happened, before the other trouble you got into – if you had come in here with a plea of guilty and been honest about [it] and said, 'Of course I did it,' which you did, you would probably have gotten a modest sentence*, concurrent with the one in the District of Columbia, and you would have gotten out of it. But with this attitude that you have you can't receive that kind of treatment.

274 Md. at 539-40 (emphasis added and omitted). The court then sentenced the defendant to "twelve years, to run concurrent with the sentence that [he was] serving in the District of Columbia." *Id.* at 540. Noting that these "remarks in full [did] not necessarily demonstrate that a more severe sentence was imposed," the Supreme Court concluded that the explicit reference to the defendant's determination not to plead guilty "manifest[ed] that an impermissible consideration may well have been employed." *Id.* at 543. The sentence was vacated.

In *Abdul-Maleek*, the State requested "executed incarceration[,]" remarking that the defendant had the opportunity to "take responsibility for his actions" but had not done so. 426 Md. at 66. After hearing from the defendant, the sentencing court stated:

> You have every right to go to trial in this case, which you did—not once, but twice. [The victim] was victimized, and then she had to come back and testify in District Court; then she had to come back again and testify in the Circuit Court, and she had to do that because you have every right to have all of those opportunities to put forth your position. I am at a total loss.

*Id.* at 66-67 (emphasis omitted). The court imposed a sentence of eighteen months in the county detention center, suspending all but eight months, plus eighteen months of supervised probation upon release. On appeal, the Supreme Court observed that the sentencing court made an "explicit reference" to the defendant's exercising his "de novo appeal right[,]" and concluded that "'a reasonable person [could] infer that [the court] *might* have been motivated' by an impermissible consideration." *Id.* at 74 (emphasis in original) (quoting *Jackson*, 364 Md. at 207). The sentence was vacated.

In *Jennings*, the sentencing judge told the defendant: "For me to give you a minimum sentence just doesn't fit my role." 339 Md. at 679. After pronouncing sentence, the court explained: "Nothing is going to be suspended because this gentleman does not have any remorse, none whatsoever." *Id.* On appeal, the defendant argued "that he was improperly sentenced for refusing to admit his guilt at the sentencing hearing." *Id.* at 681. The Supreme Court distinguished *Johnson* and held that "a sentencing court may consider, on the issue of a defendant's prospects for rehabilitation, the defendant's lack of remorse." *Id.* at 688. The Court noted that it was "probable that, absent the explicit reference to the defendant's failure to plead guilty and the modest sentence that would have produced, [it]

47

would not have found [the defendant's] sentence flawed." *Id.* at 687. The Court explained

that "[u]nlike in *Johnson*, the remarks of the sentencing court reflect a search for a basis

upon which to mitigate, rather than enhance, the petitioner's sentence" and that "the

sentencing court's remarks reflect a refusal to grant the petitioner the benefit of a lesser

sentence, . . . rather than the intentional imposition of a greater one in punishment for the

petitioner's refusal to plead guilty or his continuing protestations of innocence." *Id.* at 688.

Accordingly, the Court affirmed the judgment.

Finally, in *Sharp*, a jury convicted the defendant of first-degree assault. The State

requested an above-guidelines sentence. Defense counsel suggested that the sentence

should be no different than it would have been had the defendant pleaded guilty:

> [SHARP'S COUNSEL]: . . . I'm going to ask Your Honor to consider not incarcerating [ ] Sharp outside the guidelines[,] and, in fact, Your Honor offered, if [ ] Sharp wanted to take a plea, to sentence him to twenty years [of imprisonment], suspend all but a cap of eight [years].
>
> [CIRCUIT COURT]: Um hm.
>
> [SHARP'S COUNSEL]: So that Your Honor would have heard the same facts from the State in that plea. You would have heard about the injuries, you would have theoretically seen [the victim], you would, I mean, *nothing is anything different because we went to trial, other than [ ] Sharp wanted the opportunity to speak and to defend himself* in what he believed was a situation that was more than just himself and mutual as well.

*Sharp*, 446 Md. at 679 (emphasis added; alterations in original). Taking note of the phrase,

"nothing is anything different because we went to trial," the sentencing court responded

and the following dialogue ensued:

> [CIRCUIT COURT]: So you don't believe that putting [the] State's witnesses, the victim through, reliving that and testifying in Court is no

different than if he would have admitted what he did and pled guilty in front of me? You're saying that that, that's all the same?

[SHARP'S COUNSEL]: Your Honor, I'm not saying, I'm not saying [that] it's no different[,] but I also don't—

[CIRCUIT COURT]: That's what you, you just, you just said [that] there's no difference.

[SHARP'S COUNSEL]: No, I don't believe in punishing someone for wanting to go to trial. So,—

 [CIRCUIT COURT]: Well, but the whole idea of an offer of a plea is to give something in exchange for sparing the State and the witnesses and the victims the trauma, the risk of a trial.

*Id.* at 679-80 (alterations in original). Later during sentencing, and in explaining its sentence, the court detailed the brutality and heinous character of the attack, but with no reference to the defendant's pleading not guilty. It imposed a sentence of twenty-five years, exceeding the guidelines, to run concurrently with a three-year sentence for openly wearing and carrying a dangerous weapon with the intent to injure.

Applying the "reasonable person" standard, the Supreme Court had "no difficulty" upholding the sentence. *Id.* at 691. It noted that it was defense counsel, not the court, who introduced the right-to-trial issue at sentencing and that the court correctly rebutted defense counsel's "allegation that the circuit court would be 'punishing' [the defendant] by not imposing the sentence that was part of the circuit court's plea offer." *Id.* at 692. Moreover, the court "did not make the statements at issue while announcing and giving the reasons for the . . . sentence" but during an earlier exchange. *Id.*

If the case at bar is like any of those just discussed, it is most akin to *Sharp* and *Jennings*. At sentencing, the judge made no reference to the appellant's decision to reject

49

the plea offer and proceed with trial. The court's sole reference to the "generous offer" made before trial came in response to defense counsel's comments that the appellant seemed to have followed a confused thought process in deciding to reject the plea offer and that his primary motivation seemed to be a desire to avoid incarceration, given the trauma he had experienced when he was incarcerated as a juvenile. There was no suggestion in anything the sentencing judge said that the appellant's decision to proceed with trial instead of agreeing to a plea deal factored into her sentencing determination.

In short, as the court did not err or abuse its discretion in its sentencing decision with regard to the appellant's exercising his right to go to trial, there could not be plain error.

There is no merit in the appellant's second argument either. He maintains that the judge's colloquy with T.C., M.B.'s ex-wife, and her "appearance of anger" toward him demonstrated "an unacceptable appearance of impropriety" that justifies plain error review.

Trial by an impartial judge is a basic requirement of due process. *Schweiker v. McClure*, 456 U.S. 188, 195 (1982). A court not only must be unbiased but also must avoid the appearance of bias. Although a trial judge is presumed to be unbiased, *see id.*, this presumption can be rebutted by showing that the judge "displayed deep-seated and unequivocal antagonism that would render fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 556 (1994). *Cf. In re K.H.*, 253 Md. App. 134, 154 (2021) (stating in a recusal case, "[t]here is a strong presumption that judges are impartial participants in the legal process, whose duty to preside when qualified is as strong as their duty to refrain from presiding when not qualified" (cleaned up)).

50

"Judges must vigilantly guard both their actual impartiality and their appearance of impartiality." *Belton v. State*, 483 Md. 523, 551 (2023). And, where a judge's statements may give the appearance of bias or lack of impartiality, the interests of justice may make it appropriate for an appellate court to order that, on remand, the case be assigned to a different judge. *See Mainor v. State*, 475 Md. 487, 518 (2021); *see also Diggs v. State*, 409 Md. 260, 286 (2009) (observing that a claim of judicial bias and impartiality, in cases involving a judge questioning witnesses, may be reviewed on appeal under a plain error rationale).

It is clear from the entire exchange between the sentencing judge and T.C. that the judge was assessing T.C.'s credibility and how to factor her remarks into fashioning a proper sentence. *See Ellis*, 185 Md. App. at 552 (observing that the appellate court will review the sentencing court's comments in their entirety). As we have explained, "in considering what is the proper sentence for the convicted individual standing before him, the judge saddled with the responsibility can take into account a wide, largely unlimited, range of factors." *Id.* at 557 (quotation marks and citation omitted). *Accord Logan v. State*, 289 Md. 460, 480 (1981). A sentencing court may "consider information concerning the convicted person's reputation, past offenses, health, habits, mental and moral propensities, social background and any other matters that a judge ought to have before him in determining the sentence that should be imposed." *Id.* (quotation marks and citation omitted). This includes the discretion to distinguish "credible from non-credible evidence." *Teeter v. State*, 65 Md. App. 105, 113 (1985) (noting that a sentencing court may rely on hearsay evidence).

51

The appellant directs our attention to *Mainor*. In that case, the judge made repeated "dismissive and disrespectful comments" about Mainor's mother, specifically challenging the reason she was unable to attend sentencing and refusing to postpone sentencing or grant defense counsel's request for a pre-sentence investigation. *Mainor*, 475 Md. at 496-97, 518. The Supreme Court concluded that these comments and actions, "could cause a reasonable person to question the impartiality of the trial judge." *Id.* at 518.

*Mainor* is inapposite. In the case at bar, the sentencing judge's exchange with T.C. was neither dismissive nor disrespectful. The judge was pointing out that T.C.'s statement to the court at sentencing, her letter to the court prior to sentencing, and the facts the court had learned in the course of the trial were inconsistent. The judge was bothered that T.C. was attempting to sanitize her remarks at sentencing by presenting herself solely in the role of the appellant's therapist, when in fact she was part of a love triangle that underlay the appellant's violence against M.B. These were legitimate matters for the court to consider and weigh in deciding the value, if any, of T.C.'s statement at sentencing. The judge's remarks were not improper and did not display any partiality.

As noted, the appellant asserts that the sentencing judge appeared to be angry with him during sentencing, and argues that this also is a ground on which the sentence should be vacated. The judge expressly refuted that claim on the record, stating that she was not angry at all and not angry toward the appellant.

Again, the appellant has not established any error or abuse of discretion on the part of the sentencing court, and therefore, there cannot be plain error.

**JUDGMENTS OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE ASSESSED AGAINST THE APPELLANT.**